COASTAL EXPANDED METAL CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coastal Expanded Metal Co. v. Commissioner
Docket No. 16576-85.
United States Tax Court
T.C. Memo 1988-54; 1988 Tax Ct. Memo LEXIS 54; 55 T.C.M. (CCH) 101; T.C.M. (RIA) 88054; February 18, 1988. Carolyn J. Woodruff and Reed Johnston, for the petitioner. Alan I. Weinberg, Frank C. McClanahan, III, and Paul G. Topolka, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: In a timely statutory notice of deficiency, respondent determined a deficiency in petitioner's Federal income tax for taxable year of $ 59,333. Additionally, he determined that the underpayment of tax was due to fraud and determined an addition to tax of $ 29,667 (50 percent of the underpayment). After concessions, the issues for our consideration are: (1) Whether petitioner's December 31, 1981 inventory was understated; and (2) whether petitioner is liable for the addition to tax under section 6653(b)[1] for fraud or, alternatively, for the addition to tax under section 6653(a) for negligence. *56 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts [2] and exhibits attached thereto are incorporated herein by this reference. Petitioner is a North Carolina corporation with a principal place of business at Summerfield, North Carolina, when its petition for redetermination was filed. Background Findings
Petitioner was incorporated on March 13, 1970. Robert D. Battin was petitioner's president and sole shareholder during the years 1980, 1981, and 1982. Petitioner (hereinafter sometimes referred to as "CEMCO of North Carolina") is engaged in the business of manufacturing, fabricating and selling expanded metal. Mr. Battin has over 25 years of experience in the expanded metals industry. Expanded metal is sheet metal which has been fabricated into an open mesh or weave pattern of various shapes and sizes. The process involves the use of an "expanded metal press" through which coils of carbon steel, galvanized steel, or *57 aluminum are fed. The coil of raw material is mounted on a "decoiler" which spools out the metal to the press. The expanded metal press partially shears the material and simultaneously stretches it to form a diamond-shaped open mesh. The processing through the press causes the resulting sheets of expanded metal to be curved. To remove the curve and allow the sheets to lie flat, the material is passed through a series of offset rollers called a "level roller." Depending upon the use which will be made of the expanded metal, it may also be run through a flattening roller, or "flattener." As its name implies, the flattener flattens the expanded metal, removing the louvered surface created by the expanded metal press and in the process slightly reducing the thickness of the finished product. Approximately 80 percent of petitioner's products must be flattened. There was, in the year in issue, no domestic manufacturer of the basic machinery used in the expanded metal process. Thus, the availability of equipment is one of the prime barriers to entering the expanded metal industry, or to expanding an existing business. There are currently only about a dozen manufacturers engaged *58 in this business in the United States. Mr. Battin has acquired machinery for petitioner in a variety of different ways over the years. Some pieces he acquired from bankrupt competitors. Others were adapted from similar machinery used in other industries. Although Mr. Battin has himself developed a high level of engineering skill and technical expertise over the years, he has worked closely with a business associate, Walter A. Minor, on many occasions in designing and rebuilding machinery to be used in petitioner's business. CEMCO of Florida
In the expanded metal industry, costs of shipping the finished product are a substantial production expense. In order to minimize this cost and improve petitioner's competitiveness, Mr. Battin envisioned the establishment of a number of regional manufacturing facilities across the country. To this end, Mr. Battin and Walter Minor entered into an agreement in 1978 to establish a facility near Mr. Minor's home in Pensacola, Florida, for the production of expanded metal. Mr. Minor undertook to design and build two expanded metal presses which would form the nucleus of the Pensacola operation. The vehicle for the venture would be a *59 shell West Virginia corporation which Mr. Battin had established sometime previously pursuant to an unsuccessful prior venture. The corporation would be owned jointly by Messrs. Battin and Minor and would be renamed CEMCO of Florida. CEMCO of Florida would be strictly a manufacturing operation. Orders would be placed with CEMCO of North Carolina which would contract out the actual production work to CEMCO of Florida. In connection with the name change and qualifying the corporation to do business in Florida, Battin and Minor engaged the services of a Pensacola attorney named Joe Hosner. Mr. Hosner's name had been provided by an officer at the Pensacola bank where CEMCO of Florida's corporate account had been established. After this initial assignment, Mr. Hosner was retained as CEMCO of Florida's attorney and provided additional legal services to the corporation from time to time. Other Corporations
Some time prior to April 22, 1980, Mr. Battin authorized Attorney Hosner to get up a group of corporations on behalf of petitioner. Petitioner, at the direction of Mr. Battin, paid Mr. Hosner $ 10,000 in advance to set up the corporations. The following corporations were *60 then set up by Mr. Hosner: (1) Battin Enterprises, Inc., which was incorporated in the state of Florida on June 30, 1980; (2) SEMCO of Nova Scotia, Ltd., which was incorporated in the province of Nova Scotia, Canada, on July 7, 1980; and (3) Caribbean Equipment & Metals Co., Inc., (hereinafter "Caribbean") which was incorporated in Costa Rica on July 31, 1980. The A-1 Flattener
In late 1979, Mr. Battin determined that it would be advisable to acquire another flattener for petitioner. At that time petitioner was operating with only one flattener. Since 80 percent of petitioner's products required flattening, Mr. Battin realized that petitioner would virtually have to cease operations if this machine should malfunction. In early 1980, Mr. Battin located a used Farrel three-roll vertical calendar (hereinafter the "A-1 Flattener") for sale by the A-1 Chemical Company of Chicago. Mr. Battin knew that petitioner's existing flattener had been converted from a vertical calendar which had been used in the rubber industry. He felt that a similar conversion could be possible with the A-1 machine and asked Mr. Minor to accompany him to Chicago to inspect the machinery and help him *61 determine whether a conversion was feasible. Although the machine was partially disassembled and dirty, Mr. Minor advised Mr. Battin that he felt there was a good chance the calendar could be successfully converted for use in the expanded metal industry by petitioner. Petitioner therefore purchased the calendar from A-1 on March 14, 1980 for $ 7,500. At some time subsequent to the flattener's purchase, the quotation from A-1 Chemical Company on the A-1 Flattener, petitioner's purchase order, and the original invoice from A-1 Chemical Co. were removed from petitioner's records. In their place, a false invoice from A-1 Chemical was substituted showing the purchase by petitioner of a level roller rather than the flattener. The A-1 Flattener was shipped to petitioner from Chicago via Superior Trucking Co., arriving at petitioner's plant on or about April 4, 1980. Guy M. Turner, Inc. contracted to assemble and anchor the machine in petitioner's plant, completing work on May 6, 1980. Messrs. Battin and Minor were initially unsuccessful in converting the machine for use in petitioner's business. While they were able to get the flattener to function satisfactorily on lighter metals, *62 it would not flatten the heavier gauge metals which were the bulk of petitioner's business. However, in August 1980, their efforts were successful and the flattener became fully operational at all metal gauges used by petitioner. Petitioner issued a purchase order to Caribbean dated May 14, 1980, for the purchase of a Farrel Vertical Calendar for $ 60,000. The description of the machine in the purchase order was identical to the description of the machine in the A-1 Chemical Company quotation and invoice and petitioner's purchase order issued to A-1 Chemical Company, all of which had been removed from petitioner's records. Mr. Hosner, acting on behalf of Caribbean, prepared an invoice reflecting the $ 60,000 sales price plus four percent Costa Rican sales tax for a total of $ 60,240. [3] Petitioner issues two checks, each in the amount of $ 30,120, dated September 11, 1980 and March 13, 1981, respectively, to Caribbean. In fact, no bank account had ever been established for Caribbean and both checks were applied by Mr. Hosner to his personal use. In its return for taxable *63 year 1981, petitioner claimed $ 13,491 of depreciation deductions attributable to the Farrel Vertical Calendar it allegedly purchased from Caribbean for $ 60,240. Petitioner has conceded herein that such depreciation deductions were not allowable. Inventory
Petitioner is a calendar year, accrual basis taxpayer. Petitioner maintains inventories of raw materials, work-in-process, resale items, and finished goods. Raw materials consist of coils of carbon steel, galvanized steel, and aluminum which petitioner either purchases directly from mills or from other suppliers. Work-in-process consists of goods in various states of fabrication at the inventory cut-off date. Resale items consist of sheets of expanded metal which petitioner purchases for resale rather than manufactures itself. Finally, finished goods consist of expanded metal which has been completed and awaits sale. Since the bulk of petitioner's business consists of custom orders, finished goods inventory is rare. Petitioner uses a periodic, rather than a perpetual, inventory accounting system for both accounting and tax purposes. The periodic system requires counting, measuring, and weighing goods at the end *64 of the accounting period to determine the quantities on hand. Petitioner adjusts its inventory balances based on the results of a single physical count of items on hand at the close of business on December 31. The quantities on hand are then valued at the lower level of their cost or market values as of that date. A journal entry is then made on petitioner's books to adjust inventory to coincide with the results of the physical count. An offsetting entry is made to an inventory adjustment account which has the effect of increasing cost of goods sold if inventory has decreased during the year, or decreasing cost of goods sold if inventory has increased. This single journal entry is the only entry required to be made to petitioner's inventory account during the year. Although facially satisfactory for tax purposes, the periodic inventory maintained by petitioner did not provide the timely information on raw material availability which was required in order to establish realistic production schedules. To meet this need, petitioner also maintained a production scheduling card system. A separate card was created for each category of metal utilized by petitioner. When a purchase *65 order for a particular metal was placed by petitioner, the quantity (in pounds) ordered was added to the total shown on its card. When a customer order requiring use of metal of a specific thickness and width was received, the card for that specification was consulted to determine whether sufficient quantities of that metal were in the shop so that the order could be filled. Whenever metal was used to fill a customer order, the net weight of the finished product shipped was removed from the total on its production scheduling card. In this way, plant personnel were supposed to be able to determine the quantity of a metal of particular thickness and width on hand by referring to its production schedule card. However, the amounts of material shown on the card were estimates only. The cards consistently overstated the amount of material available. This was because the reductions made when metal was used to fill a customer's order only reduced the quantity by the net weight of the finished product shipped to the customer. The weight of any scrap waste generated in the production process was not deducted from the amount of material reflected on the card. Hence the card might reflect *66 coil raw material as being present in the plant when, in fact, it was not. During 1981, petitioner began experiencing problems with the accuracy of the production scheduling cards. Work orders were accepted and machinery set up to run jobs, only to find that material to run the job was unavailable even though the card indicated that it was. The breakdown in the card system was attributed to the departure of petitioner's bookkeeper, Ron Alston, at the end of 1980 due to personal problems. Mr. Alston had bee petitioner's bookkeeper for many years and had developed the production scheduling card system. During the five months subsequent to Ron Alston's termination, petitioner had three different bookkeepers. As a result of the apparent confusion generated by this high rate of turnover, maintenance of the card system came to a virtual halt. In May of 1981, petitioner hired Joseph Iacone to be its bookkeeper. Mr. Iacone had been employed in a number of accounting and bookkeeping positions, but had no experience in the expanded metal industry. One of the first tasks assigned to Mr. Iacone was to reestablish the production scheduling card system and thereby eliminate the production *67 bottlenecks which had been plaguing petitioner since Mr. Alston's departure. In order to accomplish this task, Mr. Iacone instructed another of petitioner's employees, Edward J. O'Connell, to conduct a physical count of petitioner's inventory on or about June 9, 1981. As a result of this physical inventory, Mr. Iacone concluded that petitioner's inventory was understated by more than $ 125,000. [4] He presented his conclusions to Mr. Battin, also informing him that an understatement of such magnitude would result in an additional $ 60,000 of Federal tax liability for petitioner. Mr. Battin expressed disbelief that such an understatement was possible, and informed Mr. Iacone that no action would be taken with respect to any additional tax liability until he was convinced that Mr. Iacone's figures were correct. *68 During mid August of 1981, the problems associated with the production scheduling card system continued, and the inventory questions raised by Mr. Iacone remained unresolved. Accordingly, Mr. Battin hired Ron Alston, who had been calling for several weeks in search of work, on a two-week contract basis to compile an accurate inventory and to update the production scheduling card system. Mr. Alston was the individual most familiar with petitioner's accounting system and could thus also advise Mr. Battin regarding certain entries Mr. Iacone had been making in petitioner's books which were not understood. [5]
Mr. Alston took a physical count of inventory with the assistance of Hylton *69 Tucker, another of petitioner's employees, during the week of August 24, 1981. Mr. Alston's work papers indicate that he determined the value of inventory on hand at that date to be $ 130,931. He also beganm some work on the card system. However, Mr. Alston picked up his check on the afternoon of his fourth day on the job, left the plant, and has not been heard from since. When Mr. Battin returned from an out of town trip and was informed that Mr. Alston had left, he instructed Mr. Iacone to pick up where Alston had left off on the scheduling cards and to conduct a physical count of inventory as of August 31, 1981. Mr. Battin also gave written instructions that he was to receive copies of the physical inventory when complete, the word "all" being underscored twice. With the assistance of Hylton Tucker, Mr. Iacone conducted a physical count of petitioner's inventory on August 31, 1981. First, the thickness of the metal in a particular coil was established taking a micrometer reading. Next, a tape measure was used to determine the outside and inside diameter of the coil, as well as the width of the coil. These measurements were then entered into a formula for calculating the *70 pounds of metal in the coil. Mr. Iacone was unable to recall what this formula was. Once the measurements for a coil had been taken, a numbered inventory control card was affixed to the coil to signify that it had been counted. This procedure was then repeated for each coil. Similar procedures were followed to determine the weight of resale items and goods in process. Mr. Iacone then valued the inventory using unit values he obtained from recent supplier invoices. His total inventory value at August 31, 1981 was $ 164,225. [6]
On December 31, 1981, petitioner's employees Tony Stigall, Bruce Ellington, and Jeff Lough conducted a physical count of petitioner's inventory. The raw data sheets they used to calculate the weight of the inventory were turned over to a secretary in petitioner's office. Petitioner's bookkeeper, Susie Wentworth-Rochester, was then given inventory sheets purporting to be those compiled by petitioner's employees for calculation of petitioner's ending inventory value (Mr. Iacone had left petitioner's employ on December 17). Ms. Wentworth-Rochester *71 transferred the data from the inventory sheets onto a summary sheet and discarded the original data sheets. Using unit costs supplied by Mr. Battin, she determined an ending inventory of $ 55,586. In his statutory notice of deficiency, respondent determined that petitioner's ending inventory for 1981 was $ 177,959 rather than the $ 55,586 claimed by petitioner. The $ 122,373 difference would result in a decrease in cost of goods sold, and an increase in taxable income of like amount. In calculating ending inventory, respondent took as his starting point, the physical inventory taken by Ron Alston on August 24, 1981. The results of the Alston inventory were then rolled forward to yearend by adding it to the dollar value of raw material purchases and freight-in, and subtracting cost of goods sold for the months of September through December as follows: Alston Inventory, August 24
$ 130,931
Cost of  Purchases
Freight
Goods Sold
September
$ 101,693
$ 3,835
($ 74,749)
October
47,355
2,579
(61,804)
November
50,420
710
(70,267)
December
69,925
1,968
(24,907)
$ 269,393
$ 9,092
($ 231,727)
46,758
Respondent's December 31 Inventory
$ 177,689
Petitioner's December 31 Inventory
55,586
Understatement
[7] $ 122,103
*72 Respondent also determined in his deficiency notice that petitioner was not entitled to the $ 13,491 of depreciation deductions attributable to the A-1 Flattener which it allegedly purchased for $ 60,240 from Caribbean. Respondent also determined that the resulting underpayment of tax was due to fraud and imposed a section 6653(b) addition to tax equal to 50 percent of the total underpayment. [8]
Ultimate Findings *73 of Fact (1) Petitioner has failed to show error in respondent's determination as to the value of petitioner's inventory on December 31, 1981. (2) Petitioner's claim of $ 13,491 of depreciation on the A-1 Flattener allegedly purchased from Caribbean for $ 60,240 was fraudulent. OPINION Inventory Issue
Petitioner bears the burden of proving that respondent's inventory calculations are erroneous. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). We find that petitioner has failed to meet this burden. Petitioner primarily relies on the testimony of Tony Stigall and Susie Wentworth-Rochester to establish that its $ 55,586 inventory figure was the product of a complete and properly compiled physical count of its inventory on hand at December 31, 1981. [9]
Ms. Wentworth-Rochester was able to identify *74 the inventory summary sheet, which is the only documentary evidence of its ending inventory offered by petitioner, as her work. However, she was unable to recall who had actually conducted the physical count, nor was she able to recall who had given her the actual physical count sheets from which she compiled the summary. These physical count sheets were not produced since they were destroyed soon after the summary was compiled. Ms. Wentworth-Rochester acknowledged that in compiling her summary, she had no way of ascertaining the accuracy of completeness of the raw data on which it was based. Mr. Stigall testified that he was one of several of petitioner's employees who actually conducted the December 31 physical inventory count. He stated that he took the physical measurements of individual coils necessary to determine the coil weight, then transcribed these measurements onto a piece of paper taken from a yellow legal pad. He, along with the other employees taking the physical inventory, then turned their sheets over to an unidentified secretary in petitioner's office. We found the testimony of both witnesses, though credible, to be vague and general. As such, we find *75 it insufficient to establish the accuracy of the single page summary sheet which petitioner presents as the sole documentary evidence in support of its $ 55,586 ending inventory figure. No evidence has been offered which links any raw data sheets which may have existed to the totals contained on the summary sheet. We consider the explanation offered for petitioner's failure to retain these data sheets -- that they were too dirty and bulky to be retained in petitioner's files -- to be implausible in light of Mr. Stigall's testimony that the entire inventory consisted of only three or four sheets. Petitioner has presented no other evidence which will bridge this evidentiary gap and overcome the presumption of correctness which attaches to respondent's calculations, which are based on a physical count which is supported by detailed backup documentation, and which was rolled forward to yearend using petitioner's own books and records. Rather than defend its own inventory figure, petitioners puts much effort into an attempt to discredit the physical inventory which is respondent's starting point. [10] Although it attacks the Alston inventory on many grounds, petitioner's principal argument *76 is that it would be physically impossible to fit the quantity of inventory allegedly observed by Mr. Alston in petitioner's plant. We are unpersuaded by this argument. The proposition that petitioner's plant could hold inventory in the quantities observed by Alston is corroborated by the separate physical inventories conducted by Joe Iacone on August 31, and Ed McConnell on June 9. Each of these inventories shows inventory on hand in quantities consistent with the quantities observed by Alston. We place little reliance on the various charts and diagrams of petitioner's plant offered by petitioner to support the proposition that its plant contained insufficient storage space for inventory in the quantities observed by McConnell, Iacone, and Alston. Any probative value these exhibits may have is greatly diminished by respondent's demonstration that, despite testimony offered on behalf of petitioner, several modifications to petitioner's plant lay out had occurred during 1981. Specifically, several pieces of machinery were shipped to petitioner from CEMCO of Florida and installed in petitioner's plant in late February 1981. Also, petitioner acquired an additional decoiler and contracted *77 with a rigging company to move some machinery around in mid-December of 1981. In sum, we find respondent's determination of petitioner's inventory to be reasonable, based as it is on a documented physical count, corroborated in part by two other independent physical counts, and rolled forward using petitioner's own books and records. [11] Petitioner bears the burden of proof. It has failed to show that respondent's methodology or result is erroneous. We thus hold for respondent on this issue, subject to modification for the $ 270 transposition error respondent has conceded. *78 Fraud Issue
Respondent determined an addition to petitioner's tax for fraud under section 6653(b). Respondent has the burden of proving fraud under section 6653(b) by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Stone v. Commissioner,56 T.C. 213, 220 (1971); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). To meet this burden, respondent must establish by clear and convincing evidence: (1) that petitioner had an underpayment of tax; [12] and (2) that some part of the underpayment was due to fraud. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Otsuki v. Commissioner, supra at 105. Our holding with respect to the inventory understatement issue, based upon petitioner's failure to carry its burden of proof, does not establish by clear and convincing evidence that petitioner had an underpayment of *79 tax in the year at issue with respect to this item. See Rockwell v. Commissioner,512 F.2d 882, 885 (9th Cir. 1975), cert. denied 423 U.S. 1015 (1975); Kashat v. Commissioner,229 F.2d 282 (6th Cir. 1956), revg. in part a Memorandum Opinion of this Court; Lessman v. Commissioner,327 F.2d 990, 993 (8th Cir. 1964), affg. T.C. Memo. 1962-253. However, petitioner has conceded that it was not entitled to the $ 13,491 depreciation deduction it claimed with respect to the A-1 Flattener. [13] Thus, the remaining question for our determination is whether the conceded underpayment as to this issue was due to fraud. *80 The existence of fraud is a question of fact that we must resolve upon considering the entire record. Teitelbaum v. Commissioner,294 F.2d 541, 547 (7th Cir. 1961); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977). Fraud is never presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Otsuki v. Commissioner, supra.Respondent must show petitioner's intent to evade taxes that he knew to be owing by demonstrating his conduct of concealing, misleading or preventing the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968); affg. a Memorandum Opinion of this Court; Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Respondent rarely can show fraud by direct proof of the taxpayer's intention, but may show fraud by circumstantial *81 evidence. Rowlee v. Commissioner, supra at 1123; Stone v. Commissioner, supra at 223-224. The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. Stone v. Commissioner, supra at 223-224; Otsuki v. Commissioner, supra at 105-106. The training and experience of a taxpayer must also be considered in relation to allegations of fraud. See Solomon v. Commissioner,732 F.2d 1459, 1461 (6th Cir. 1984), affg. a Memorandum Opinion of this Court; Iley v. Commissioner,19 T.C. 631, 635 (1952). The fraudulent acts of a corporate agent may be imputed to the corporation. Federbush v. Commissioner,34 T.C. 740, 749 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963). Making implausible or inconsistent explanations of behavior is evidence or fraud. See Bradford v. Commissioner,796 F.2d 303, 307 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Gromacki v. Commissioner,361 F.2d 727, 730 (7th Cir. 1966), affd. a Memorandum Opinion for this Court. Although petitioner *82 has conceded that it was not entitled to depreciation deductions for the A-1 flattener, it denies that claiming the deduction was fraudulent. Rather, petitioner claims that it was the victim of a scheme concocted and perpetrated by Joe Hosner to defraud petitioner. Upon consideration of the entire record before us, we conclude that the underpayment of tax with respect to the claimed depreciation deduction on the A-1 Flattener was attributable to the fraud of petitioner. Mr. Battin authorized Mr. Hosner to set up a tiered group of corporations on behalf of petitioner. Mr. Battin contends that he authorized Hosner to establish the new corporations in order to shield petitioner from possible product liability suits with regard to expanded metal machines which its "Machine Division" intended to design and build with the aid of Mr. Minor and market overseas. Mr. Battin claims to have approached Richard Tuggle, his attorney in North Carolina, prior to authorizing Mr. Hosner to set up the foreign group. He claims that Mr. Tuggle advised him that he could not be of assistance since he lacked expertise in the area of foreign corporations. According to Mr. Battin, he then approached *83 Mr. Hosner who recommended the formation of a Canadian corporation which would be wholly owned by the Canadian corporation. Title to machinery built by petitioner would be passed through the Canadian corporation to the Cayman Islands corporation which would sell the machines to third parties overseas. Mr. Hosner explained that these transactions would eliminate petitioner's products liability exposure since Cayman Islands law prohibited disclosure of the identity of the owners of the Cayman Islands corporation to potential claimants. As an added benefit, Mr. Hosner advised Mr. Battin that United States tax on any profits from machine sales by the Cayman Islands corporation would be deferred until those profits were repatriated to the United States. [14]
Mr. Battin contends that despite his *84 instructions, Hosner established three corporations rather than the two which were authorized. He created Battin Enterprises, Inc., SEMCO of Nova Scotia, Ltd., and substituted Caribbean for the Cayman Islands corporation that had been discussed earlier. According to Mr. Battin, Mr. Hosner told him that the revised foreign group he had created would provide better protection from products liability suits than would the original plan. Mr. Battin was to own all of the stock of Battin Enterprises which would own all of SEMCO of Nova Scotia which would own all of Caribbean. However, Mr. Battin acknowledged that he never received any stock certificates, and was unsure of his ownership. At some time after Mr. Battin authorized creation of the new corporations, he claims to have informed Mr. Hosner of the difficulties petitioner had been experiencing with the A-1 Flattener and of his intention to sell it. According to Mr. Battin, Mr. Hosner suggested that he acquire personal ownership of the A-1 Flattener from petitioner, and exchange it for the stock of Battin Enterprises. Battin Enterprises would then transfer the machine to SEMCO of Nova Scotia in exchange for its stock. Finally, *85 SEMCO of Nova Scotia would transfer it to Caribbean for Caribbean's common stock. Caribbean would then sell the machine. In order to obtain personal ownership of the A-1 Flattener, Mr. Battin claims that he transferred a level roller, which he owned personally, but which was used by petitioner, to petitioner in exchange for the A-1 Flattener. Mr. Battin had not documents verifying his ownership of the level roller, nor could he recall from whom he acquired it and at what price. Mr. Battin claims that he did not get personally involved with the mechanics of the transaction, but rather, instructed petitioner's bookkeeper, Ron Alston, to make appropriate entries on petitioner's books. Mr. Battin contends that it was Ron Alston, acting on his own initiative, without his or petitioner's authorization or knowledge, who removed the A-1 Chemical documents and substituted the falsified invoice in its place in petitioner's records. Once the flattener became operational Mr. Battin contends that he contacted Mr. Hosner and requested that the transactions which resulted in Caribbean's ownership of the A-1 Flattener be unwound and title returned to petitioner. Attorney Hosner allegedly replied *86 that the transactions could not simply be reversed, but that petitioner and Caribbean must deal at arms length and negotiate a fair market price for its resale to petitioner. Hosner and Battin allegedly settled on a $ 60,000 sales price for the new operational flattener. Battin caused petitioner to pay the $ 60,000 plus $ 240 purported Costa Rican sales tax to Hosner for return of the title to the A-1 Flattener. However, no title documents had ever been transferred, and the machine had never left petitioner's plant. Hosner, as agent of Caribbean, endorsed the two $ 30,120 checks issued by petitioner and apparently applied the funds to his own use. Battin contends that he is the innocent victim of an unscrupulous lawyer who gained his trust and then defrauded petitioner of $ 60,240. We find Battin's testimony in this regard incredible and give it little weight. We find it incredible Mr. Battin's contention that he approached Mr. Hosner about setting up the tiered foreign group in the spring of 1980 in order to shield petitioner from products liability suits on expanded metal equipment it planned to manufacture with the assistance of Mr. Minor and sell overseas. The only documentary *87 evidence produced by Mr. Battin to substantiate his concern over products liability matters is an insurance quote given in July of 1982, long after the new corporations had already been established. He presented no documentation from Attorney Hosner which corroborates his testimony as to the objectives for setting up the new corporations. Mr. Battin testified that he only approached Mr. Hosner after having first approached his North Carolina lawyer, Dick Tuggle, who declined his assistance due to a lack of expertise in the area of foreign corporations. Though Mr. Tuggle was apparently available to testify, he was not called by petitioner, leading to the inference that his testimony would not provide the corporation Mr. Battin says it would. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Finally Mr. Minor, whose expertise was crucial to the success of petitioner's "Machine Division," never knew of the foreign corporations set up to supposedly market the machines he would design. Indeed, Mr. Minor testified that there was no plan to sell equipment overseas, but rather a vague hope *88 that such a plan could be developed in the future. Mr. Minor was under the impression that any machines he designed and built were to equip the regional manufacturing centers petitioner hoped to develop along the lines of CEMCO of Florida. Mr. Battin contends that he traded a level roller he personally owned, but which was located in petitioner's plant and used by petitioner, for the A-1 Flattener in order to acquire personal ownership of its so that he could trade it for Battin Industries stock. However, Mr. Battin could provide no documentary evidence as to his ownership of the level roller. He could recall none of the details as to when he acquired the level roller, from whom, or at what price. He claims to have entrusted the details of the exchange to Ron Alston who substituted the false A-1 invoice and removed the valid documents relating to the acquisition of the A-1 Flattener from petitioner's books and records. Petitioner, however, did not call Ron Alston to testify, raising the inference that his testimony would not support the version of events as related by Mr. Battin. See Wichita Terminal Elevator Co. v. Commissioner, supra at 1165. In addition, *89 we find it implausible that Alston would have gone through the cumbersome process of removing all evidence of the A-1 transaction from petitioner's files and creating a doctored invoice when a simple journal entry would have sufficed, unless he had been instructed to do so by someone else. [15]
Once he and Walt Minor were able to get the A-1 Flattener to perform, Mr. Battin paid $ 60,240 to Caribbean to regain title to the machine. Mr. Battin's great concern for gaining title to the machine from a corporation which to his knowledge he controlled is interesting, given that petitioner for many years used the level roller Battin alleges he owned personally without a like concern that title to it reside with petitioner. In sum, we find Mr. Battin's explanations of petitioner's dealings with Mr. Hosner and the transactions with regard to the A-1 Flattener to be implausible. Mr. Battin's explanation that he sincerely believed that petitioner was required to pay $ 60,240 to a corporation he controlled for a machine petitioner had paid $ 7,500 for *90 several months earlier and which had never left petitioner's plant is incredible, especially coming from a man with Mr. Battin's business acumen, developed from over twenty-five years of experience in a highly competitive business. The only reasonable explanation for the transaction with Caribbean is that it was part of a scheme to fraudulently inflate the cost of the A-1 Flattener and to extract the machine's "purchase price" from petitioner without any tax cost to Battin. The fact that the scheme has apparently backfired and Mr. Battin is out the $ 60,240 he thought he was merely transferring from one pocket to the other is of no consequence. We thus find that the proprietary of the addition to tax for fraud provided by section 6653(b) has been clearly and convincingly proved by respondent. The 50-percent fraud addition to tax is applied to the entire amount of the underpayment, not merely the fraud-tainted item. Biggs v. Commissioner,440 F.2d 1, 6 (6th Cir. 1971); Webb v. Commissioner, supra at 378. If the 50-percent addition to tax for fraud is *91 assessed, respondent may not assess the negligence addition. Sec. 6653(b); sec. 301.6653-1 (b)(2)(ii), Proced. & Admin. Regs. We therefore need not consider respondent's alternative position concerning additions to tax under section 6653(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
2. On February 3, 1987, the parties filed a first stipulation of facts, along with a first supplemental stipulation of facts. Also, additional facts and exhibits were orally stipulated at trial. ↩
3. The invoice incorrectly calculated four percent of $ 60,000 as being $ 240 rather than $ 2,400. ↩
4. It appears that Mr. Iacone erroneously believed that petitioner used a perpetual, rather than a periodic, system of accounting for inventory. His estimate of a $ 125,000 understatement appears to have been derived by comparing petitioner's January 1, 1981 opening inventory of $ 14,899 to the results of his physical inventories. Since under petitioner's method of accounting, the opening inventory on its books and records was not required to be adjusted until the yearend physical count, a discrepancy between this balance and the results of any interim physical inventory was to be expected. ↩
5. Under the mistaken belief that petitioner employed a perpetual inventory system, Mr. Iacone had been attempting to adjust the inventory account monthly by adding purchases of raw material during the month, and substracting the cost of goods sold which appears in petitioner's sales and cash receipts journal. However, these cost of goods sold amounts were memorandum entries only and did not affect petitioner's books and records. No adjustments of the inventory account were required until yearend. ↩
6. Using the same unit values as those used by Ron Alston, Joe Iacone's inventory value would have been $ 130,195. ↩
7. The notice of deficiency showed an inventory understatement of $ 122,373. The difference is due to a $ 270 transposition error made by respondent in totaling the purchase totals from petitioner's general ledger. The freight on purchases was also taken from petitioner's general ledger. The cost of goods sold was taken from petitioner's Sales and Cash Receipts Journal. ↩
8. In the alternative, respondent alleges that the underpayment with respect to both items was due to petitioner's negligence and seeks an addition to tax pursuant to sec. 6653(a). Respondent bears the burden of proof on the negligence issue since it was raised by him for the first time in his amended answer. Larsen v. Commissioner,T.C. Memo. 1984-398↩; Rule 142(a). 9. Petitioner and respondent stipulate that there is no dispute as to the unit values of inventory on hand at December 31, 1981. The discrepancies between the ending inventories of each is based on a dispute as to the quantities↩ of material on hand. 10. We agree with petitioner that respondent's notice of deficiency is based on the Alston inventory of August 24, not, as respondent claims, on the Iacone inventory of August 31. The $ 130,931 starting point used by respondent is undoubtedly Alston's. ↩
11. We are aware that the cost of goods sold figures taken from petitioner's Sales and Cash Receipts Journal and used by respondent to roll forward the Alston inventory to yearend were estimates which were not posted to the General Ledger. However, petitioner has offered no evidence which demonstrates that these estimates were unreasonable. ↩
12. As relevant here, sec. 6653(c)(1) defines "underpayment" for sec. 6653↩ purposes, as equivalent to a "deficiency" as defined under sec. 6211. 13. Petitioner now claims that it is entitled to a theft loss deduction for the $ 60,240 that it paid Hosner, as agent for Caribbean, for the A-1 Flattener. As only the taxable year 1981 is before us, we need not reach this issue since it has been stipulated that any theft loss which may have occurred was not discovered until after 1981. See sec. 163(e) (theft loss deduction sustained in the year the theft is discovered). ↩
14. Of course this advice, if given, was erroneous. The Cayman Islands corporation would constitute a controlled foreign corporation (CFC) pursuant to sec. 957(a). The United States shareholders of a CFC are taxed on the CFC income as if the CFC had declared a dividend of its income on the last day of its taxable year regardless of whether an actual distribution is made. Sec. 951(a). ↩
15. Why would Alston, a mere employee with no ownership interest in petitioner, have done all this on his own initiative? Cui bono? ↩