CONROE OFFICE BUILDING, LTD, OLIVER Y. AND HELEN CHUNG, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, PETER AND MARTHA DISCLAFANI, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, PETER DISCLAFANI, D.D.S., P.C. PENSION FUND, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, JOE A. IZEN, JR., A PARTNER OTHER THAN THE TAX MATTERS PARTNER, MARTHA IZEN, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, JOE A. AND FAYE J. IZEN, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, PASADENA EAR, NOSE AND THROAT CLINIC, P.A. PENSION FUND, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, AND BENJAMIN E. AND LOIS WRIGHT, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Conroe Office Bldg., Ltd. v. Commissioner
Docket No. 26465-87
United States Tax Court
T.C. Memo 1991-224; 1991 Tax Ct. Memo LEXIS 246; 61 T.C.M. (CCH) 2655; T.C.M. (RIA) 91224; May 22, 1991, Filed *246 Decision will be entered under Rule 155. Afton J. Izen, for all petitioners except Martha Izen. Martha Izen, pro se. Cheryl M. D. Rees, for the respondent. SCOTT, Judge. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION On March 10, 1987, respondent issued a Notice of Final Partnership Administrative Adjustment (FPAA) in regard to Conroe Office Building, Ltd. (hereinafter referred to as Conroe, the partnership), for the calendar years 1983 and 1984. Some issues raised by the pleadings have been disposed of by agreement of the parties leaving for decision the following: (1) Whether the partnership is entitled to deductions for depreciation for the taxable years 1983 and 1984, and if so, the amount of such deductions; (2) whether the partnership is entitled to deductions for repair expenses for the taxable years 1983 and 1984, and if so, the amount of such deductions; (3) whether the partnership is entitled to a deduction for an appraisal fee paid during the taxable year 1983; and (4) whether the special allocation of partnership losses claimed on the Forms K-1 attached to Conroe's returns of income should be disregarded. FINDINGS OF FACT Some of the facts have *247 been stipulated and are found accordingly. The partnership timely filed its 1983 and 1984 Partnership Returns of Income with the Internal Revenue Service Center in Austin, Texas. During both years in issue, Conroe was a cash basis Texas limited partnership. The partnership was formed on December 25, 1979. Minns, Izen, Bradt & Associates, P.C. (Minns) was the partnership's only general partner. Sometime before the years in issue, Minns was dissolved and replaced as general partner by Witword, Inc. Drs. Hearn and DiSclafani were two of a number of limited partners in the Conroe partnership. Prior to April 15, 1984, the Limited Partnership Agreement was amended. There was no substantive change in the agreement, only a substitution of general partner and a change in ownership of the limited partnership interests. From 1979 until 1986 the partnership held approximately 25 meetings. Beginning with its Partnership Return of Income for the calendar year 1979, the partnership claimed depreciation on buildings, which it stated were acquired on November 1, 1979. The property on which the partnership claimed depreciation deductions is composed of two buildings which were attached and *248 in some ways gave the appearance of being one building. The buildings were built in 1946, and at that time the land and buildings were owned by Etheridge Enterprises. On June 15, 1978, the smaller building and the lot on which it stood were sold by Etheridge Enterprises to Mr. and Mrs. Hemann for $ 50,000. Mr. Hemann paid Etheridge Enterprises a down payment of $ 4,000 and Mr. and Mrs. Hemann executed a $ 46,000 note for the remainder of the purchase price. Mr. Hemann also executed a deed of trust in favor of E. Mason Martin II, as trustee. On September 8, 1978, the larger building and the lot on which it stood were sold to Midwestern Mortgage Company, Inc. (Midwestern). Midwestern gave a $ 200,000 real estate lien note in payment for the land and building. Mr. Hemann signed the note as president of Midwestern. At the time of the sale of the properties by Etheridge Enterprises to the Hemanns and Midwestern, the second floor of the structures had been vacant for some time, and only three out of seven spaces on the first floor were rented. The City of Conroe was requiring that the second floor be rewired before it could be utilized for rental purposes. On October 9, 1979, *249 Mr. and Mrs. Hemann transferred the smaller building and the lot on which it stood to Minns, as trustee, subject to the $ 46,000 note from the Hemanns to Etheridge, on which $ 43,700 was then due. Also on that date, the larger building and the lot on which it stood were transferred from Midwestern to Minns, as trustee, subject to the $ 200,000 real estate lien note, on which $ 174,800 was then due. On October 9, 1979, Dr. Hearn and Dr. DiSclafani signed a recourse promissory note in favor of Midwestern in the amount of $ 129,168.28 and a recourse promissory note in favor of Mr. and Mrs. Hemann in the amount of $ 36,000. The understanding of the partners was that Drs. Hearn and DiSclafani would be indemnified by the other partners as to the notes. The partnership was willing to pay the amount of the notes over the indebtedness for the properties since the partners believed it was understood that Midwestern would assist the partnership in obtaining a loan to renovate the buildings. On November 13, 1981, Joe Izen, Jr., as trustee, obtained a 1-year $ 500,000 insurance policy on the properties. The properties were insured as vacant office buildings through Lumbermans Mutual Insurance *250 Company by a policy written by J. D. Hamon Insurance Agency. On March 30, 1982, Lumbermans Mutual Insurance Company wrote J. D. Hamon Insurance Agency informing it that, due to receipt of an outside inspection report on the properties, the company wished to be relieved of coverage on the property prior to the end of the policy's term. The insurance agency was given until April 15, 1982, to inform the company of replacement coverage. The company stated in its letter that otherwise, direct notice of intent to cancel would be mailed to the insured. On May 10, 1982, Lumbermans Mutual Insurance Company mailed a Notice of Cancellation or Nonrenewal to Joe Izen, Jr., trustee, informing him of the company's intent to cancel insurance coverage on the property on June 15, 1982. In 1982 a complaint was filed by Dr. Hearn and Dr. DiSclafani against the Hemanns and Midwestern in the District Court of Harris County, Texas. In this suit it was alleged that at the time Drs. Hearn and DiSclafani along with other partners of the Conroe partnership agreed to purchase the Conroe buildings at the price asked by the Hemanns and Midwestern, the sellers agreed to procure a loan for the partnership *251 to renovate the buildings. The allegation was made that, despite many requests that the loan be procured and promises from the sellers that it would be, no such loan was procured, but the sellers were demanding payment of the notes. Further allegations were made that a settlement was reached in which the notes would be repaid at $ 25,000 a year for 10 years, with a balloon payment at the end of 10 years with the sellers agreeing to subordinate the debt to a loan to be procured by the partnership to renovate the buildings. It was further alleged that the defendants were paid $ 25,000 on the notes, but plaintiffs had not come forward with the subrogation agreement. A number of claims were made for damages for the failure on the part of defendants to carry out their agreement, including a claim that the notes should be rescinded. The suit was dismissed in 1986 and, upon dismissal, collection of the promissory notes was barred by the statute of limitations. Only $ 25,000 had been paid on the two promissory notes before the expiration of the statute of limitations. Mr. Etheridge leased a parking area around the Conroe buildings to the Hemanns for a period of 10 years with a right *252 of first refusal to the lessee for an additional 5 years. The rent was stated to be 1/100 of the appraised value of the leased area per month. Nine of the 10 years remained on the parking lot lease when it was acquired by Minns. In 1980, the City of Conroe posted a fire notice on the buildings and threatened to evict the remaining tenants or take legal action. The last tenant vacated the premises sometime in 1980. Subsequent to 1980, the City of Conroe refused to issue an occupancy permit for the buildings. In 1980, the partnership reported $ 1,550 of income from rent. No rental income was reported in any of the subsequent years during which the partnership held the Conroe property. The partnership did not advertise the property or any part of it for rent. On April 1, 1982, a building inspector of the City of Conroe made a Condemned Structure Survey regarding the Conroe property and notified a limited partner of the partnership of the Survey on May 12, 1982. The survey stated as the reasons for the condemnation: windows broken out, roof leaking, ceiling falling, general deterioration of interior, general deterioration of exterior, lack of maintenance, the need for total *253 electrical rewiring and total replumbing. Joe Izen, Jr., a limited partner in the partnership, obtained an injunction to halt demolition of the buildings, which at the time was in its beginning stages. On December 3, 1982, the District Court of Montgomery, Texas, in an Agreed Temporary Order, approved a compromise settlement agreement submitted by the parties. Under the agreement, the partnership was required to completely reroof the buildings, clean the buildings of rubbish, remove the existing awning and supports from the outside of the buildings, completely board up or replace all windows, and repaint the outside of the buildings. In December of 1982, the partnership contracted with the Jesse Lovelace Construction Company (Construction Company) to do the necessary work. In consideration for $ 70,500, the Construction Company agreed to do the following work for the amounts indicated: Replace skylight
$  3,250
Remove all old roofing and put on new 4 ply
roof as per sketch attached
34,000
Decking
1,550
Flashing
3,800
Repairing trusses
2,200
Repair framing, new roof and new siding on
elevator building on top of roof
1,200
Remove old second floor windows and replace;
seal downstairs windows as per sketch attached
18,000
Down windows boarded
1,000
Clean inside of building
5,500
Total Cost of Work to Be Done
$ 70,500
*254 The partnership paid the Construction Company $ 35,000 on March 29, 1983. No further payments were made in 1983. The partnership paid the Construction Company $ 28,828.04 in 1984, which included $ 3,550.00 interest. With the exception of $ 4,000 claimed as repairs and maintenance expenses in 1980, the partnership had no repairs or renovations done to the property prior to December 31, 1983, except for those completed by the Construction Company. On June 4, 1984, the partnership paid Conroe Manufacturing, Inc., $ 7,197.50. The check stub of Conroe with respect to the payment bore the notation "remove awning * * * paint exterior." No other partnership funds were expended to repair or maintain the buildings. Mr. Joe Izen, Jr., on behalf of the partnership talked to a number of representatives of lending institutions during the years 1982 through 1984 in an effort to obtain loans sufficient to place the buildings in rentable condition. Mr. Izen also discussed planned renovations of the buildings with various officials of the city or county government. Mr. Izen, on behalf of the partnership, had a number of conversations with the representative of the Conroe Main Street Project *255 sponsored by the Chamber of Commerce and prospective tenants with respect to rental of the Conroe buildings during the years 1984 and 1985. Several possible plans for rentals of the buildings were developed during this period, but none resulted in rentals. From 1982 through 1984, three local taxing authorities, including the City of Conroe, the Conroe Independent School District, and Montgomery County, Texas, appraised the property on which the partnership claimed depreciation. Under each of these appraisals, 58.1 percent of the appraised value was allocated to land and 41.9 percent of the appraised value was allocated to the improvements. On February 21, 1983, the partnership issued a check to Gere A. Tharpe, Real Estate Consultant & Appraiser, in the amount of $ 1,000. The memo on the check states that it was paid for "Appraisal: Conroe Office Building." Article 5.01 of the Limited Partnership Agreement and Amended Limited Partnership Agreement provides that the amount of net profits and net losses of the partnership to be allocated to and charged against each partner shall be determined by the percentage set opposite his name in exhibit A attached to the agreement. Nowhere *256 in either agreement is it specified how the percentage was determined. During a 1982 meeting of "a quorum" of the partnership, it was unanimously agreed that the Pasadena E.N.T. Clinic Defined Benefit Pension Fund (Pasadena Pension Fund) would shift its pro rata share of partnership losses to its vested beneficiaries and Joe Izen, M.D., and that the Peter DiSclafani, D.D.S., P.C. Pension Fund (D.D.S. Pension Fund) would shift its pro rata share of partnership losses to its vested beneficiaries who were its partners. The following tables list the percentage of profit, loss, and ownership of capital as reported on the Forms K-1 attached to the 1983 and 1984 partnership returns: 1983
Partner
Profit
Loss
Capital
Chung
26.666
26.666
26.666
DiSclafani
10
26.666
10
D.D.S. Pension Fund
16.666
-0-
16.666
Joe Izen, M.D.
13.333
26.666
13.333
Pasadena Pension
Fund
13.333
-0-
13.333
Joe Izen, Jr.
10
10
10
Wright
10
10
10
1984
Partner
Profit
Loss
Capital
Chung
26.666
26.666
26.666
DiSclafani
10
26.666
10
D.D.S. Pension Fund
16.666
-0-
16.666
Joe Izen, M.D.
13.333
26.666
13.333
Pasadena Pension
Fund
13.333
-0-
13.333
Joe Izen, Jr.
10
10
10
Wright
10
10
10
Witword, Inc.
0.0002
0.0002
0.0002
*257 The partnership claimed deductions for repairs in 1982, 1983, and 1984 in the amounts of $ 50,000, $ 70,500, and $ 7,197.50, respectively. The partnership computed its depreciation deduction by claiming a cost basis in the Conroe property of $ 440,000. It allocated $ 60,000 (13.6 percent) of the basis to the land and $ 380,000 (86.4 percent) to the buildings. On its return of income for the taxable year 1983, the partnership claimed depreciation on a components basis with the following allocations: Value assigned
Useful life assigned
Asset
by partnership
by partnership
Building
$ 230,000
20 years
Furniture & fixtures
20,000
5 years
Roof
50,000
6 years
Electrical system
40,000
4 years
Air-cond. system
40,000
4 years
Total
$ 380,000
On its return of income for the taxable year 1984, the partnership used the same allocation, with the exception of the air-conditioning system, which had by then been fully depreciated. The partnership computed its depreciation deduction without allowing any amount for salvage value. The partnership claimed total depreciation deductions on the component parts in 1983 and 1984 in the amounts of $ 40,500 and $ 30,500, respectively. *258 On its partnership return of income for 1983, Conroe deducted $ 1,000 for a business expense for an appraisal fee. Respondent in his FPAA disallowed the depreciation deduction claimed by Conroe for each of the years 1983 and 1984. Respondent also disallowed the expense deductions claimed for repairs and for an appraisal fee and allocated the losses according to the partnership interest set forth in Exhibit A to the partnership agreement rather than as shown on the Forms K-1 attached to the Partnership Return of Income. OPINION ISSUE 1: DEDUCTION FOR DEPRECIATION
Respondent argues that the partnership is not entitled to a depreciation deduction on the Conroe buildings because it has not proven: (1) That the partnership owned the structures or a depreciable interest therein, (2) that it has properly computed its basis in the buildings, (3) that it is entitled to and properly computed component depreciation, (4) that it properly allocated the basis between depreciable and nondepreciable assets, (5) that the buildings had not been fully depreciated prior to the years in issue, (6) that the buildings had no salvage value, and (7) that the depreciable assets were used in a trade *259 or business or held for the production of income. Petitioners contend that it had an ownership interest in the buildings under Texas law since the property was held in trust for it and that it is entitled to depreciation deductions as claimed for the years 1983 and 1984. State law is applied to determine the legal interest a taxpayer has in property. Aquilino v. United States, 363 U.S. 509, 4 L. Ed. 2d 1365, 80 S. Ct. 1277 (1960); Morgan v. Commissioner, 309 U.S. 78, 82, 84 L. Ed. 585, 60 S. Ct. 424 (1940). Under Texas law, trusts may be either express or implied. At the time the property was transferred to the trustee, the Texas Trust Act was in effect. Tex. Rev. Civ. Stat. Ann. art. 7425b-1 et seq. (Vernon 1951). Although the Texas Trust Act was later repealed, any express trust that was created at the time the Act was effective must then have been in compliance with the Act to be currently valid. Tex. Prop. Code Ann. sec. 111.006(2) (Vernon 1984). Under Tex. Rev. Civ. Stat. Ann. art. 7425b-7, an express trust consisting of real property can only be created by a written instrument. There was no written instrument creating a trust to hold the Conroe property. The Conroe property was not held *260 in the name of the partnership but rather in the name of the original general partner, Minns, as trustee. The mere designation of the general partner as trustee on the warranty deeds does not create an express trust. Nolana Development Association v. Corsi, 682 S.W.2d 246, 249 (Tex. 1984); Fred Rizk Construction Co. v. Cousins Mortgage & Equity Investments, 627 S.W.2d 753, 757 (Tex. Ct. App. 1981). In Spiritas v. Robinowitz, 544 S.W.2d 710, 715 (Tex. Civ. App. 1976), the Court in discussing the "Requisites of a Trust" stated: Nothing within article 7425b-7 includes a partnership agreement where one of the partners takes title to the partnership property in his name as "trustee." Designation of a party as "trustee" does not in itself create a trust. [Citation omitted.]
Without a written instrument creating an express trust to hold real property, the Texas Trust Act has not been complied with. Accordingly, because the Texas Trust Act was not complied with, no express trust was created. Because the Texas Trust Act applies only to express trusts, its provisions are not applicable to the facts before this Court. *261 See, e.g., Nolana Development Association v. Corsi, supra; Spiritas v. Robinowitz, supra.
Implied trusts are either resulting or constructive trusts. They usually arise by operation of law or rules of equity for the purpose of carrying out the presumed intentions of the parties or to protect against fraud. See Nolana Development Association v. Corsi, supra.
Resulting trusts arise when one person purchases land with the funds of another, but takes title to the land in his own name. Such person holds the land in trust for the person whose funds were used. O'Connor v. Vineyard, 91 Tex. 488, 44 S.W. 485, 487 (1898). The person who supplies the funds has an equitable interest in the property. Jewell v. Jewell, 602 S.W.2d 315, 317 (Tex. Civ. App. 1980). Because Minns purchased the property with funds to be supplied by the partnership and held title in Minns' name, as trustee, we find that a resulting trust was created at the time of the transaction. The partnership, as beneficiary of the resulting trust, has an equitable interest in the property. It is further *262 noted that resulting trusts are expressly excluded from the definition of "trust" for purposes of the Texas Trust Act. Tex. Rev. Civ. Stat. art. 7425b-2. Also, under Texas law, unless a contrary intention is shown, property that has been acquired with partnership funds is treated as partnership property. Conrad v. Judson, 465 S.W.2d 819, 828 (Tex. Civ. App. 1971), cert. denied 405 U.S. 1041, 31 L. Ed. 2d 582, 92 S. Ct. 1312 (1972). To be allowed a deduction for depreciation, petitioners must establish that the partnership owned the property or owned a depreciable interest in the property. Where it has been shown that the equitable owner bears the burden of the wear and exhaustion of the property, the equitable owner is entitled to the depreciation deduction. See Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 84 L. Ed. 226, 60 S. Ct. 209 (1939). Petitioners have established that the partnership, as beneficiary of the resulting trust, bore the burden of the wear and exhaustion of the property. Accordingly, the deduction for depreciation on the property is to the extent allowable to be taken by the partnership. Respondent contends that the acquisition of the Conroe property violated *263 provisions of the partnership agreement. In support of this contention, respondent argues that, under the partnership agreement, if the general partner acquires real property in its own name, it is required to place a written declaration of trust in the partnership books and records, acknowledging that it acts in that capacity and naming the true or equitable owner, the partnership. Respondent states that no such declaration with respect to the Conroe property was placed in the partnership books or records. Petitioners contend that the provision of the partnership agreement referred to by respondent is inapplicable to the present facts. Petitioners further contend that the partnership agreement specifically empowers the general partner to take title to property in trust, with the partnership as equitable owner. Article VI of the partnership agreement, referred to by petitioners provides: All real or personal property, including all improvements placed or located thereon, acquired by the Partnership shall be owned by the Partnership, or in trust by the General Partner for the Partnership as the equitable beneficiary of a trust in name only, such ownership being subject to the *264 other terms and provisions of this Agreement. * * *
Section 8.03 of article XIII captioned "Nominees," referred to by respondent, provides: All partners recognize that sometimes there are practical difficulties in doing business as a limited partnership, occasioned by outsiders seeking to satisfy themselves relative to the capacity of the General Partner to act for and on behalf of the Partnership, or for other reasons. Therefore, the Limited Partners hereby specifically authorize the General Partner to acquire all real and personal property, arrange all financing, enter contracts, and complete all other arrangements needed to effectuate the purposes of this Partnership, either in their own name or in the name of a nominee, without having to disclose the existence of this Partnership. If the General Partner decides to transact the Partnership business in its own name or in the name of a nominee, they shall place a written declaration of trust in the Partnership books and records that acknowledges the nominee's capacity in which it acts and the name of the true or equitable owner, being the Limited Partnership.
The provision referred to by respondent addresses circumstances *265 where the general partner is acting in its own name without disclosing that it is acting on behalf of the partnership. Minns did not take title to the property in its own name, but rather as trustee. The clear indication from the record is that the Hemanns and Midwestern were aware that Minns was acting on behalf of the partnership. Because Minns did not transact partnership business in its own name and was not acting in the capacity of a nominee, section 8.03 of article XIII is not applicable. Article VII governs the transfer of the property and allows Minns to take title to the property as trustee for the partnership. Accordingly, there has been no violation of the partnership agreement. In order to determine the deduction for depreciation allowable resulting from exhaustion and wear and tear of property used in a trade or business or held for the production of income, it is necessary to determine the basis of the property. Respondent argues that the partnership did not properly compute the basis of the property to be used in determining the amount allowable as a depreciation deduction. Under the facts in this case, the basis of the Conroe property to the partnership for *266 the purpose of determining depreciation is its cost to the partnership. Secs. 167(g), 1011, 1012. Cost of property includes personal liabilities incurred by the purchaser and liabilities subject to which the property is taken. Crane v. Commissioner, 331 U.S. 1, 91 L. Ed. 1301, 67 S. Ct. 1047 (1947). The partnership took the property subject to the lien note and deed of trust. At the time of the transaction, the Hemanns and Midwestern had paid all amounts currently due under the terms of the lien note and deed of trust. In determining the amount of indebtedness to which the property was subject when it was acquired by the partnership, the face amounts of the lien note and deed of trust must be reduced by the payments made by the Hemanns and Midwestern to Etheridge. The partnership took the property subject only to the outstanding liability on the debt instruments. The amounts of $ 16,000 and $ 9,200 had been paid on the real estate lien note before the property was transferred to the partnership. Therefore the indebtedness represented by the $ 200,000 note had been reduced by $ 25,200 before the property was transferred. The amount of $ 2,300 had been paid on the deed of trust before *267 the transfer of the other property, thereby reducing the $ 46,000 note by $ 2,300. Two recourse promissory notes were executed by Drs. Hearn and DiSclafani on October 9, 1979, in part payment for the property. Upon formation of the partnership, the property purchased by execution of the promissory notes by Drs. Hearn and DiSclafani was placed in the partnership and the partnership agreed to indemnify Drs. Hearn and DiSclafani on the notes. On the facts here, we conclude that the notes were indebtedness of the partnership. Accordingly, the basis of the property consists of the amount of the indebtedness subject to which the property was taken plus the amount of the promissory notes executed by Drs. Hearn and DiSclafani to the extent they were unconditional and in payment for the property. Crane v. Commissioner, 331 U.S. 1, 91 L. Ed. 1301, 67 S. Ct. 1047 (1947); sec. 752(c). Respondent contends that the notes executed by Drs. Hearn and DiSclafani were in consideration of the promise of the Hemanns and Midwestern to obtain financing for the partnership. Respondent argues that the financing was to be used to complete renovations to the property, which were required to make the purchase commercially *268 feasible. Respondent concludes that the notes are not properly includable in the basis of property since they were not given in purchase of the property. Petitioners contend that even though the partnership would not have bought the property unless the partners had believed the sellers would assist in getting a renovation loan, the notes given by Drs. Hearn and DiSclafani were in payment for the property and not for obtaining a loan. We agree with petitioners. The evidence supports the conclusion that Drs. Hearn and DiSclafani gave the notes as part of the purchase price of the property. Respondent also argues that the notes should not be considered as part of the basis of the property since they were both satisfied for less than their face amount. Only $ 25,000 was paid on the notes. The collection of the remaining amount became barred by the statute of limitations in 1986. The fact that the amount of the obligation is, in a subsequent year, satisfied for a lesser amount, does not necessitate a recomputation of the cost basis of the property. Mayerson v. Commissioner, 47 T.C. 340, 354 (1966); Blackstone Theatre Co. v. Commissioner, 12 T.C. 801 (1949). *269 Unless the suit commenced in 1982 made the notes too contingent to be considered as part of the basis of the property, the basis of the property includes the full amount of the promissory notes as executed at the time of the purchase of the property, even though they were subsequently satisfied for less than full value. The 4-year statute of limitations on instituting suit to collect on the promissory notes would have expired in 1983, but was tolled by the action brought before the District Court of Harris County, Texas. When the case was dismissed by the District Court in 1986, the statute of limitations expired and collection of the amounts remaining due on the notes was barred. The main focus of the suit was the failure of the sellers to assist the partnership in obtaining a loan to renovate the buildings. Under the facts here, we conclude that the notes are part of the basis of the property. Depreciation may either be computed on the structure as a whole, or on the component parts. Under the component method of depreciation, the cost of the building is allocated according to its basic component parts. Each component part is assigned a separate useful life and depreciated *270 as a separate item of property. This method is only utilized where " * * * the cost of acquisition is properly allocated to the various components based on their value and useful lives are assigned to the component accounts based on the condition of such components at the time of acquisition." * * *
Fieland v. Commissioner, 73 T.C. 743, 752 (1980), quoting Rev. Rul. 73-410, 1973-2 C.B. 53. It is generally only practical to use the component method of depreciation where an owner of property has a building constructed or adds improvements to an existing building. In such situations, the cost of the individual components is susceptible of precise ascertainment and the allocation can be made accordingly. Fieland v. Commissioner, supra at 751-752. See, e.g., Shainberg v. Commissioner, 33 T.C. 241, 254 (1959). Depreciation is computed on the entire structure when a precise determination of the cost of the individual pieces cannot be made. Fieland v. Commissioner, supra at 751-752. Because of the requirement of an appraisal of the component parts, used property *271 is generally depreciated as an entire structure. Respondent argues that the partnership is not permitted to use the component method of depreciation because the property was purchased as a unified asset and the value of the components cannot be precisely calculated in relation to the overall purchase price. The partnership argues that it has offered proof of the value of the component parts of the property. As evidence of the fair-market value of the component parts, petitioners point to the values stated on the partnership return of income. Such evidence is self-serving and fails as substantiation of the fair-market value of the component parts at the time of the purchase of the property. Petitioners also cite as evidence of the value of the roof and wiring the cost of replacing the roof and rewiring the buildings. Petitioners fail to distinguish between the value of the component parts at the time the partnership purchased the buildings and the cost of replacing them. Only the value of the parts at the time of acquisition is relevant for purposes of component depreciation. Fieland v. Commissioner, 73 T.C. at 751-752. Petitioners have failed to introduce *272 any evidence that the component parts of the buildings were valued at the time the partnership acquired the property or any evidence of what the values would have been, had there been a valuation. There has been no showing that any portion of the purchase price was allocated to individual components by the parties involved in the sale. Accordingly, the partnership is not entitled to use the component method of depreciation, and depreciation is required to be based on the value of the buildings as an entire structure. Section 1.167(a)-5, Income Tax Regs., provides: In the case of the acquisition on or after March 1, 1913, of a combination of depreciable and nondepreciable property for a lump sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time. * * *
In computing its annual depreciation deduction, the partnership allocated 13.6 percent of the basis in the property to the land and the remaining basis to the buildings. Respondent argues that the buildings had no *273 value on the date the partnership purchased them and therefore that no portion of the basis should be allocated to them. Petitioners bear the burden of proving that respondent's allocation is incorrect. Rule 142(a); Elliott v. Commissioner, 40 T.C. 304, 313 (1963). Respondent argues that the holdings of Lynchburg National Bank & Trust Co. v. Commissioner, 20 T.C. 670 (1953), affd. 208 F.2d 757 (4th Cir. 1953), and Barry v. United States, 501 F.2d 578 (6th Cir. 1974), govern this case. In Lynchburg National Bank & Trust Co. v. Commissioner, supra, improved land was purchased with the intention that the building be destroyed. In Barry v. United States, supra, the owner of improved land entered into a lease that gave the lessee an option to demolish the building at any time. The sole reason the lessee entered into the lease was to retain possession of the land. In accordance with this intention, the lessee ultimately exercised its option and had the building demolished. In both Lynchburg National Bank & Trust Co. v. Commissioner, supra, *274 and Barry v. United States, supra, the improvements were found to have no value at the time of acquisition. The facts in Lynchburg National Bank & Trust Co. v. Commissioner, supra, and Barry v. United States, supra, are not comparable to those in this case. Petitioners have shown that the partnership did not intend to demolish the buildings at the time of acquisition. At the time of acquisition, the partnership believed that the buildings could be rented. As part of the original agreement, the Hemanns and Midwestern were to obtain financing that would enable the partnership to renovate the buildings. When the financing did not materialize and the original agreement became entangled in a legal dispute, the partnership considered other options for renting the property and obtaining financing. The partnership continued its efforts to rent the property throughout the years here in issue. Respondent also argues that, because extensive repairs were required to be done to the buildings and because the county eventually condemned the buildings, they had no value. We find this argument unpersuasive. On the basis *275 of the evidence in this case, we conclude that the buildings had a value greater than zero and that a portion of the purchase price should be allocated to them. Petitioners offered no persuasive evidence of how the partnership arrived at the allocation of the purchase price between the land and buildings. Mr. Etheridge was asked to give an estimate as to the value of the buildings. His testimony shows that his estimate was not based on the facts, which are shown in this record, and is worthless. His estimate was based on his belief that the buildings were being rented in 1982. The record is clear that there were few tenants in the buildings after sometime in 1980 and no rental of the buildings after sometime in 1980 and no rental of the buildings after 1980. The only reliable basis of allocation in this record is that of the local and county taxing authorities. From 1982 through 1984 the City of Conroe, the Conroe Independent School District, and Montgomery County, Texas, all appraised the property on which the partnership claimed depreciation. They each allocated 58.1 percent of the appraised value to the land and 41.9 percent to the improvements. We conclude that this is *276 the best evidence in this case of a proper allocation and hold that 58.1 percent of petitioners' total basis in the property is allocated to the land and 41.9 percent to the buildings. Respondent also argues that a portion of the sales price must be allocated to the lease of the adjacent parking area. Nine years of the 10-year lease remained when the partnership obtained the property. There was also the possibility that Mr. Etheridge would offer the partnership a right of first refusal to lease the parking area for another 5 years upon expiration of the original 10-year lease. Even though the lease agreement stated that the parking area would be leased at 1/100 of the appraised value per month, there was no appraisal of the land and the partnership did not make any direct payments on the lease. Mr. Etheridge considered any payments due under the lease as having been paid by the Hemanns and Midwestern as part of the sales price of the Conroe property. Based on this record, we conclude that any value of the parking lease would be part of the basis to the partnership of the land and would not reduce the basis to the partnership of the buildings. Respondent contends that the partnership *277 is not entitled to its claimed depreciation because it did not compute a salvage value below which the structure could not be depreciated. Petitioners contend that, because the salvage value was negative, the salvage value did not have to be calculated and was immaterial. Petitioners argue that at the end of the estimated useful life of the buildings, the partnership would have to pay more to have the buildings destroyed than there was value in any salvageable materials. Salvage value is the amount estimated to be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. Sec. 1.167(a)-1(c)(1), Income Tax Regs. The salvage value is the estimated resale or secondhand value at the end of the useful life of the asset in the taxpayer's business. Massey Motors, Inc. v. United States, 364 U.S. 92, 107, 4 L. Ed. 2d 1592, 80 S. Ct. 1411 (1960). An asset cannot be depreciated below its salvage value. Sec. 1.167(a)-1(c)(1), Income Tax Regs.
Net salvage value is salvage value reduced by the cost of removal. Either salvage or net salvage value may be used *278 to determine the depreciation allowance as long as the practice is consistently followed. Sec. 1.167(a)-1(c)(1), Income Tax Regs. Negative net salvage value occurs when the estimated charges for removing the building exceed the estimated salvage value. Based on the evidence in this case, we conclude that the salvage value of the buildings would not exceed the cost of their demolition, and since petitioners have failed to show a negative salvage value, no adjustment for salvage value is necessary. Respondent next argues that the partnership is not entitled to depreciation deductions in 1983 and 1984 because, prior to 1983, it had already fully depreciated the structure. Petitioners contend that respondent did not assert the claim that the buildings had been fully depreciated in prior years in the FPAA. Accordingly, petitioners argue that the burden of proof is on respondent and that respondent has failed to satisfy this burden of proof. In the FPAA, respondent disallowed the depreciation deduction on very broad grounds. The partnership was put on notice that respondent determined that the partnership was not entitled to a depreciation deduction in the years here in issue. *279 This puts in issue whether the buildings had been fully depreciated before the years here in issue and the burden is on petitioners to show that the buildings had not been. Sorin v. Commissioner, 29 T.C. 959, 969 (1958), affd. per curiam 271 F.2d 741 (2d Cir. 1959). Respondent's theory that the buildings had already been fully depreciated is premised on respondent's contention that depreciation deductions taken in prior years were in excess of the amount of depreciation allowable. This theory is consistent with the language of the FPAA. Allowable depreciation is the amount of depreciation correctly determined. Allowed depreciation is the amount claimed on the tax return and not questioned by the Internal Revenue Service that provides a tax benefit. Sec. 1.1016-3(b), Income Tax Regs. In the case of property held by a partnership, the tax benefit includes that benefit resulting to the partners from the deduction by the partnership of the depreciation allowed to the partnership. Sec. 1.1016-3(e)(4), Income Tax Regs. The basis of the property is adjusted by the greater of the amount allowed or the amount allowable. Sec. 1016(a)(2); sec. 1.1016-3(b), *280 Income Tax Regs.
Petitioners have not established that the partners, individually, did not receive a tax benefit from the deduction by the partnership of the depreciation. Accordingly, we find that to the extent of the amounts taken as depreciation deductions in prior years, there was a tax benefit to each partner. The depreciation allowed in years prior to 1982 was as follows: Year
Amount allowed
1979
$  6,750
1980
40,500
1981
40,500
1982
40,500
Depreciation allowable is determined by applying 41.9 percent to the basis in the property consisting of indebtedness of $ 218,500 to which the buildings were subject when the partnership purchased them plus the $ 165,168.78 of notes given in further payment for the property based on a 20-year useful life for the buildings. Respondent has not questioned the 20-year useful life used by the partnership. In determining the amount of depreciation taken in prior years, the greater of the allowed amount as set forth above or the allowable amount for years prior to 1983 must be used. See Texaco, Inc. v. United States, 217 Ct. Cl. 416, 579 F.2d 614 (1978); Computing & Software, Inc. v. Commissioner, 65 T.C. 1153 (1976).
*281 Respondent, while not contesting the profit objective of the partnership, contends that the partnership is not entitled to a deduction for depreciation because it did not hold the buildings in a trade or business or for the production of income and therefore is not entitled to depreciation under section 167(a). The partnership contends that it held the buildings in a rental trade or business. Whether a taxpayer intends to rent property is a question of fact to be determined from all the evidence. Horrmann v. Commissioner, 17 T.C. 903, 908 (1951). The property here involved was devoted to or placed in the rental trade or business in 1979 when it was rented to tenants. Once placed in a trade or business, the property does not have to be continuously rented to be considered as used in the trade or business of the partnership: To read the phrase "used in the trade or business" as meaning only active employment of property devoted to the business would lead to results which we cannot believe Congress intended. For example, one factory of a large industrial plant may lie idle for a year, and in fact suffer depreciation as great, or greater, than that sustained *282 by the factories in operation. To allow no depreciation for the idle factory would be most unfair to the taxpayer, for he must claim the deduction in his tax return for the year when the depreciation occurs, and may not take it in a later year. See Hardwick Realty Co. v. Commissioner, 2 Cir., 29 F.2d 498, 500. Hence we think the phrase should be read as equivalent to "devoted to the trade or business"; that is to say, that property once used in the business remains in such use until it is shown to have been withdrawn from business purposes.
P. Dougherty Co. v. Commissioner, 159 F.2d 269, 271 (4th Cir. 1946), affg. 5 T.C. 791 (1945), quoting Kittredge v. Commissioner, 88 F.2d 632, 634 (2d Cir. 1937), affg. a B.T.A. Memorandum Opinion. Although the buildings were not rented from sometime in 1980 through the years in issue, the evidence shows that the buildings were in need of renovations before renting was viable. The evidence shows that from the time the partnership purchased the property it was investigating means by which it could finance the required renovation of the property. The purchase was *283 made with the belief that a loan would be forthcoming. When the loan was not forthcoming, the partnership entered into discussions with the Hemanns and Midwestern to restructure the purchase in a manner that would more easily allow the partnership to obtain other financing. The partnership also considered other means of utilizing the buildings and ways of obtaining financing. When none of the means of financing the renovation came to fruition, the partnership considered tearing down the buildings and constructing another. The buildings are considered as remaining in the rental business until they have been shown to have been withdrawn from the business. After having been placed in the rental business in 1979, the property was not removed from the rental business before the end of 1984. In his brief, respondent refers to case law addressing the profit objective of the partnership in holding the Conroe property. Because respondent conceded at trial that the partnership did not lack a profit objective, this is not an issue before the Court. ISSUE 2: DEDUCTION FOR REPAIRS
Respondent contends that the amounts claimed as deductions for repairs by the partnership on the 1983 *284 and 1984 partnership returns are not allowable because the expenses were not ordinary and necessary business expenses and were not expended for the designated purpose. Respondent further contends that to the extent the amounts are determined to be noncapital in nature, they are not allowable deductions because the property was not used in a trade or business or held for the production of income. Petitioners contend that the amounts were expended to repair the property so as to prevent its demolition. In support of this contention, petitioners argue that the payments preserved the value of the improvements and were ordinary and necessary business expenses associated with the burdens of ownership. Section 162 provides for deduction of ordinary and necessary business expenses and section 263(a) provides that amounts paid for permanent improvements or betterments of property shall not be deductions but shall be capitalized. Repair costs, deductions of which are allowable, are the costs of "incidental repairs." "Incidental" imports that the repairs be necessary to some other action. Bloomfield Steamship Co. v. Commissioner, 33 T.C. 75, 83 (1959), affd. 285 F.2d 431 (5th Cir. 1961). *285 Section 1.162-4, Income Tax Regs., provides: The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. * * *
The evidence in this case demonstrates that the expenditures made in connection with the property were essential to "put" it in rentable condition and were not made to "keep" it in that condition. Prior to the renovations, the partnership could not have rented the buildings as the buildings were not at that time in compliance with city standards. Involuntary modifications made to comply with orders of municipalities or regulatory bodies have been held to be capital items and not deductible expenses. Even though they may not improve the property by increasing its attractive appearance or efficiency, or prolonging its life, such modifications do render the property more valuable for the taxpayer's use by bringing *286 the property into compliance with applicable regulation. [Citations omitted.]
Teitelbaum v. Commissioner, 294 F.2d 541, 544 (7th Cir. 1961), affg. a Memorandum Opinion of this Court; Hotel Sulgrave, Inc. v. Commissioner, 21 T.C. 619 (1954). The repairs were involuntary modifications that materially enhanced the value, life expectancy, and usefulness of the buildings as compared to their status prior to the repairs. Also the very list of the items as set forth in our findings for which payment was made to the Construction Company, such as a new roof, new windows, and the like, show that they were capital in nature. The partnership paid the Construction Company $ 35,000 on March 29, 1983. No other payments were made in 1983. The partnership reported $ 70,500 for repairs on its 1983 return. The partnership paid the Construction Company $ 25,278.04 for construction work in 1984. We have listed the work which the Construction Company agreed to perform for the $ 70,500. Most of this work was for capital improvements. Only $ 60,278.04 of the $ 70,500 was paid. So, on the basis of this record, we conclude that all payments to the Construction *287 Company were for capital improvements. On June 4, 1984, the partnership paid Conroe Manufacturing, Inc., $ 7,197.50. The check stub stated that this payment was for removing an awning from the buildings and painting the exterior. While removing an awning and painting are the type of work that could be an expense, petitioners have not shown that in this case this work was not part of the general restoration of the buildings. Therefore, on the basis of this record, we conclude that this amount also should be capitalized. We hold that the partnership should capitalize the $ 35,000 paid in 1983 and the $ 32,475.54 paid in 1984. The parties stipulated that except for some work done in 1980, no repairs or renovations had been done to the property prior to 1984 except for those completed by the Construction Company in 1983 as a result of the contract entered into in 1982. The partnership reported $ 50,000 for repairs on its 1982 return of income. Respondent contends that this $ 50,000 was erroneously reported on the 1982 return and therefore any repairs in subsequent years should be reduced by $ 50,000. Petitioners argue that the 1982 year is not before this Court and that assessments *288 for 1982 are barred by the statute of limitations. Assuming that the $ 50,000 deduction taken in 1982 was erroneous, it does not follow that it was taken for the same items to which the claimed deductions in 1983 and 1984 related. Here we have a situation where the partnership erroneously claimed a deduction in a prior year, but paid out in a later year an amount for capital improvements. This situation is comparable to that addressed in Las Cruces Oil Co. v. Commissioner, 62 T.C. 764, 768-769 (1974), where we distinguished cases involving deduction in the nature of depreciation, depletion, and amortization at 768 n. 9. This same distinction applies here. We conclude on the basis of this record that the $ 35,000 spent by the partnership for capital improvements in 1983 and the $ 32,475.54 spent by the partnership for capital improvements in 1984 should be depreciated over the useful life of the buildings remaining in the year the amounts were expended, which appears to be 17 years in 1983 and 16 years in 1984. ISSUE 3: APPRAISAL FEE
Respondent argues that the partnership is not entitled to a deduction for appraisal fees in the amount of $ 1,000 for the *289 taxable year 1983 because the partnership has not established that it was an ordinary and necessary business expense or that it was expended for the designated purpose. Petitioners contend that the appraisal expenditure was a reasonable and necessary expense which materially contributed to the business of the partnership and therefore that the partnership is entitled to a deduction. The parties agree that a payment in the amount of $ 1,000 was made in 1983 to Gere A. Tharpe. They disagree as to whether the partnership has established that it is entitled to deduct that amount. On February 21, 1983, a check was issued to Gere A. Tharpe, Real Estate Consultant & Appraiser, in the amount of $ 1,000. The memo on the check states that it was for appraisal of the Conroe Office Building. The evidence shows that in 1983 the partnership was attempting to borrow money to renovate its buildings. Although the evidence does not directly tie the appraisal fee to this evidence, we conclude that, considering the record in this case as a whole, the copy of the check is sufficient to establish that the partnership paid the $ 1,000 as an appraisal fee in connection with its trade or business. *290 We, therefore, hold that the amount of $ 1,000 paid for the appraisal fee is properly deductible by the partnership as a business expense in 1983. ISSUE 4: SPECIAL ALLOCATION
In general, a partner's distributive share of income, gain, loss, deduction, or credit shall be determined by the terms of the partnership agreement. Sec. 704(a). The partnership agreement includes any modifications that are made until the time required for the filing of the partnership return which are agreed to by all the partners or which are adopted in such other manner as may be provided by the partnership agreement. Sec. 761(c). The limited partnership agreement could be amended or modified by the partners only by written instrument executed by partners owning collectively at least a 95 percent interest of the partnership. During a 1982 meeting of the partnership, it was unanimously agreed by "a quorum" of partners that the Pasadena Pension Fund would shift its pro rata share of partnership losses to Joe Izen, M.D. and its vested beneficiaries and that the D.D.S. Pension Fund would shift its pro rata share of partnership losses to its vested beneficiaries who were its partners. Petitioners have *291 not established that the modification in the allocation was agreed to by all the partners or partners collectively owning at least a 95 percent interest. There is nothing in this record to show what amount of interest in the partnership constituted "a quorum." Modification of the Limited Partnership Agreement required a written instrument executed by partners owning collectively at least a 95 percent interest of the partnership. Regardless of whether the minutes of the meeting could qualify as such a written instrument, petitioners have not established that partners owning collectively at least a 95 percent interest of the partnership were present at the meeting to approve the modification. Accordingly, the modification in the allocation is not considered part of the partnership agreement under section 761(c). See Kresser v. Commissioner, 54 T.C. 1621 (1970). All allocation of partnership items must be according to the Amended Limited Partnership Agreement and the special allocation referred to in the minutes of the meeting held in 1982 has no effect. Because we find that the modification was not part of the partnership agreement, we do not reach the *292 question of whether the special allocation would have substantial economic effect. Decision will be entered under Rule 155.