Abraham **TEITELBAUM**, Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 13150.

United States Court of Appeals Seventh Circuit.

Aug. 24, 1961.

Rehearing Denied Oct. 3, 1961.

542

Abraham Teitelbaum, Beverly Hills, Cal., for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Tax Division, Michael I. Smith, Lee A. Jackson, I. Henry Kutz, Norman H. Wolfe, Attorneys, Department of Justice, Washington, D.C., for respondent.

Before HASTINGS, Chief Judge, and MAJOR and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

Petitioner, Abraham Teitelbaum, seeks review of decision by the Tax Court which reversed in part and affirmed in part determinations made by the Commissioner of Internal Revenue, respondent herein.

On behalf of himself and his partner, (his first wife, Esther Melnick Teitelbaum) the petitioner paid a jeopardy assessment in excess of $340,000 including taxes, interest, penalties and costs, for the years 1944 through 1948. In 1955, there was another jeopardy assessment against petitioner for the years 1949 through 1951. Mr. Teitelbaum's petitions for re-determination of both assessments were consolidated for trial.

Mr. Teitelbaum lists the contested issues as follows:

1. The trial Court Judge Russell E. Train should have in good conscience informed Petitioner at the start of the hearings of the consolidated petitions for tax redetermination, that he was the minority member of the King Congressional Committee in 1951 investigation of Income Tax Irregularities in which proceeding Petitioner was a main witness, who thought it was his civic duty to give testimony in which he was an intended victim of a $500,000 extortion plot.

Had Judge Train, at the start of the proceedings, made a statement as to his being a member of the minority group of the King Congressional Committee, or an attorney on the Staff of the Joint Committee on Internal Revenue taxation, then his statement having been made, it would have been up to Petitioner either to exercise his Constitutional prerogative to ask or not to ask for a change of venue. Tr. pp. 1387, 1430.

On pages 192–193 of the Tr., Petitioner called to the Court's attention his participation as a witness before the King Congressional Committee. This remark was made in Petitioner's opening statement to the trial Judge. Tr. p. 148.

2. The majority of the rulings of the trial Judge were erroneous in law and not based on the evidence.

3. The rulings of the trial Judge in favor of Petitioner did not result in the return of any money paid under protest, because of his ruling in the second tax case.

4. The burden of proof of fraud, being on Respondent, the same was not discharged.

5. The trial Judge failed to honor the stipulations of facts filed in the cases. Tr. pp. 127 to 145 Incl.

■ From the record it appears that Judge Russell E. Train, who heard this case in the Tax Court, was an attorney on the staff of the Joint Committee on Internal Revenue Taxation and never a member of the staff of the King Subcommittee. Judge Train was a mere spectator to Mr. Teitelbaum's testimony as a witness before the King Subcommittee, and took no position adverse to Mr. Teitelbaum. Mr. Teitelbaum, himself, stated in the Tax Court hearing:

"I am perfectly satisfied with your Honor. I certainly wouldn't have asked for a change of venue * * *." [Tr. 1398]

The record affords no support for any finding of disqualifying personal bias or prejudice. Tucker v. Kerner, 7 Cir., 1950, 186 F.2d 79, 23 A.L.R.2d 1027.

■ While Mr. Teitelbaum was counsel for the Chicago Restaurant Association, he received certain sums which he characterized as Christmas bonus gifts and which he did not report as taxable income. Whether these sums were gifts exempt from tax or were taxable compensation presents a question of fact. If the payments proceeded primarily from the constraint of a moral or legal duty, they were not gifts. Bogardus v. Commissioner, 1937, 302 U.S. 34, 41, 58 S.Ct. 61, 82 L.Ed. 32. The minutes of the Chicago Restaurant Association disclose the motive for these payments. The minutes indicate:

" * * * at this time of the year we usually consider the matter

of a Christmas Gift to Mr. Teitelbaum to cover additional expenses which he incurs." [Exh. QQ.]

In a letter from the Executive Vice-President of the Association, Mr. Teitelbaum was advised:

"In the past years, * * * you received sums of money at or about Christmas each year, * * * While the latter was in the nature of a gift, it was intended to augment your expense account * * You have always advised us that the expenses we gave you, in addition to the basic retainer, was not sufficient." [Exh. 38]

The Tax Court's finding that the Christmas bonus gifts were compensation is not clearly erroneous and must stand. Federal Rules of Civil Procedure, Rule 52(a), 28 U.S.C.A.

■ It was stipulated between the parties that (Second Supplemental Stipulation of Facts):

"23. The partnership return of Teitelbaum and Simon for the year 1950 claimed a deduction for the conversion of electricity in the Fine Arts Building from D.C. to A.C. This conversion was done pursuant to an ordinance of the City of Chicago."

Mr. Teitelbaum deducted the cost of this conversion (almost $80,000) as an ordinary and necessary expense paid or incurred during the taxable year in which it occurred. It was Mr. Teitelbaum's contention that the conversion added nothing to the value of the building, although his architect, on cross-examination, did state that he would advise a buyer who contemplated the purchase of a building in which such conversion was required by ordinance and had not yet been made, to take the cost of such conversion into consideration in arriving at a purchase price.

The Tax Court held that the electric conversion was a capital expenditure which must be amortized out of the income from the years of its useful life. Mr. Teitelbaum argues that the Tax

Court thus ignored the stipulation quoted above. We find no contradiction between the stipulated facts and the Tax Court's finding. The mere fact that the conversion was involuntary and made only to comply with a city ordinance does not render it an ordinary expense. Involuntary modifications made to comply with orders of municipalities or regulatory bodies have been held to be capital items and not deductible expenses. Even though they may not improve the property by increasing its attractive appearance or efficiency, or prolonging its life, such modifications do render the property more valuable for the taxpayer's use by bringing the property into compliance with applicable regulation. Parkersburg Iron & Steel Co. v. Burnet, 4 Cir., 1931, 48 F.2d 163, 164, 165; R. K.O. Theatres, Inc. v. United States, Ct. Cl., 1958, 163 F.Supp. 598, 602; Woolrich Woolen Mills v. United States, 3 Cir., 1961, 289 F.2d 444.

In 1948, Mr. Teitelbaum and his first wife acquired property near Indio, California, which included a date ranch and residential facilities. The Tax Court found that out of a total consideration of $127,372.09, at least $88,872.09 was allocable to the residence and related improvements, which included a main house with a high-ceilinged, two-fireplace living room of 45 x 60 feet, a guest house, swimming pool, pool house and servants' house. About $21,000 was allocated to the land and $17,500 to the trees and related improvements. There were also a caretaker's house, a house for the farm laborers, 300 date trees covering about six to seven acres, and about two and one-half acres of grapefruit. Mr. Teitelbaum asserts that the date ranch was never intended to be a recreational hobby but was conducted as a separate business enterprise which, in the hands of his predecessor, had earned a profit of as high as $45,000 in one year. However, that predecessor had informed Mr. Teitelbaum that during the years following World War II, the price of dates declined, and that an overall loss had resulted for the most recent year, which

would be claimed by the predecessor as a business loss for tax purposes. Mr. Teitelbaum had also sought information from the Date Growers' Association in California. In 1947, domestic date prices were declining, partly because of newly begun importation of dates from abroad.

■■ The absence of a profit motive is significant in determining whether an enterprise is conducted as a business. White v. Commissioner, 6 Cir., 1955, 227 F.2d 779, certiorari denied 351 U.S. 939, 76 S.Ct. 836, 100 L.Ed. 1466. Where a taxpayer derives substantial income from other occupations, the size and character of his regular business, of the farm, its operation and records, his time and effort expended, and the nature of the residential facilities, are all elements in determining whether the taxpayer is conducting a business venture for profit or cultivating a farm as an adjunct to a country residence. Morton v. Commissioner, 2 Cir., 1949, 174 F.2d 302, certiorari denied 338 U.S. 828, 70 S.Ct. 77, 94 L.Ed. 503; Coffey v. Commissioner, 5 Cir., 1944, 141 F.2d 204.

Mr. Teitelbaum was allowed to deduct his losses from this operation in 1948, and he contends that no change in operation occurred for succeeding years. The first Mrs. Teitelbaum used the big house and its related buildings as her major residence from the time of its acquisition and continuously after her separation from Mr. Teitelbaum in 1949.

■ The Tax Court found that no adequate records were maintained for the date ranch, the substantial residential expenses being commingled with those of the farming operation. The Tax Court characterized Mr. Teitelbaum's evidence in this regard as "a mass of unsorted cancelled bills." No effort had been made to segregate them. The evidence supports the Tax Court's conclusion that no attempt had been made to put the ranch on a paying basis, that Mr. Teitelbaum devoted little time to the operation and exercised no managerial responsibility after separating from his wife in 1949. In Field v. Commissioner, 26 B.T.A. 116 (1932) affirmed 2 Cir., 1933, 67 F.2d 876, and in Security First National Bank of Los Angeles v. Commissioner, 28 B.T.A. 289 (1933), on which Mr. Teitelbaum relies, there was a complete separation of the residence and farming facilities in both accounting and operation, and a business-like effort to conduct a profit-making venture. Although Mr. Teitelbaum asserts that he acquired the property in hopes of securing gains, there was no basis for a finding that he had a good faith intention to operate the date ranch as a business venture for profit.

■ On May 31, 1944, the Tyted Company was incorporated under the laws of the State of Illinois. Mr. Teitelbaum was its initial registered agent. The total authorized stock was 1000 shares. On June 2, 1944, the corporation issued 1000 shares of its capital stock. Nine hundred ninety-nine shares went to Mr. Teitelbaum and his first wife, Esther Melnick Teitelbaum, as joint tenants. They paid no consideration for the stock. The remaining share went to Josephine Melnick. The ownership of the capital stock remained unchanged through December 31, 1947. The Tax Court found that on April 24, 1945, the corporation acquired record title to the Fine Arts Building and portions of the Auditorium Hotel and Theatre, in Chicago. The corporation's actual interest was an undivided one-half interest with beneficial ownership of the other undivided one-half interest in Paul R. Simon or Bessie L. Simon. On May 1, 1945, the corporation conveyed title to the La Salle National Bank, as trustee, with power of direction vested in Mr. Teitelbaum and Mrs. Esther Melnick Teitelbaum. The trust agreement provided that the beneficial interest in the properties was in Tyted Company. On February 27, 1947, the corporation sold to Roosevelt College its beneficial interest in the Auditorium Hotel and Theatre portions of the property, and the trustee conveyed the legal title to the College. The consideration consisted of checks dated Feb-

ruary 6, 1947, in the amount of $10,000 and February 27, 1947, in the amount of $142,000, and a promissory note payable to bearer in the face amount of $250,000, which was valued at $200,000 according to the tax return for 1949 to which reference is made below.

On May 1, 1947, the corporation assigned its interest under the trust, which purported to be the entire beneficial interest in the Fine Arts Building: an undivided one-half to Bessie L. Simon and an undivided one-half interest to Mr. Teitelbaum and Mrs. Ether Melnick Teitelbaum.

During 1949, Mr. Teitelbaum received three interest payments of $2,500 each on Roosevelt College's note. He was then negotiating with the College for the sale of the note, which was in fact sold that same year, and for which Mr. Teitelbaum received an additional $190,000. He reported the selling price as $197,-500 in the tax return for 1949 [Exh. 23] but reported no interest for that year. He explained in the capital gains schedule that the three $2,500 payments, originally treated as interest, were, on closing the sale, to be treated as principal in accordance with an agreement of seller and purchaser. However, no other evidence of this agreement was introduced. Mr. Teitelbaum testified that the agreement had been evidenced by a letter which was lost among his files. He promised [Tr. 885] to produce the original or a copy of it. It does not appear that it was ever produced. Thus the determination of whether the interest payments were by agreement converted to principal rested on the Tax Court's evaluation of Mr. Teitelbaum's credibility on this point. The Commissioner's investigation had disclosed no knowledge of this agreement on the part of the Roosevelt College authorities. The Tax Court found that the note was sold for $190,000 and that the three earlier payments of $2,500 each did constitute interest payments. That finding is not clearly erroneous.

■ In 1951, Mr. Teitelbaum acquired the stock of Metropolitan Radio Corporation of Chicago (which operated radio station WMOR) from various persons, including two officials of the Chicago Restaurant Association, at about ten cents on the dollar. On the joint individual partnership income tax return filed by Mr. Teitelbaum and Mrs. Esther Melnick Teitelbaum, the following loss was claimed:

"Radio Station W.M.O.R.:

"I advanced the sum of $71,213.18 to discharge the payroll debts, rent, taxes due to the government for Social Security and Withholding taxes of F.M. Radio Station, operated by myself. The corporate name was merely retained as a legal convenience and the station was never operated as a corporation. No income was received and funds were advanced by myself personally .................. 71,213.18"

The Tax Court found that $22,269.88 of the $71,213.18 claimed by Mr. Teitelbaum represented items which did not constitute expenses of WMOR, and that items totalling $20,901.94 had been previously deducted on tax returns. The Tax Court did conclude that at least $48,289.83 had been advanced by Mr. Teitelbaum to pay expenses of Metropolitan Radio Corporation of Chicago.

In 1952, Metropolitan Radio Corporation of Chicago was the subject of a petition in bankruptcy. On April 18, 1952, Metropolitan was adjudicated bankrupt. The list of claims filed in the bankruptcy included Mr. Teitelbaum's claim for loans in the amount of $71,-213.18. However, except for the fact of the bankruptcy in 1952, no evidence of the uncollectibility of the advances made by Mr. Teitelbaum was submitted to the Tax Court. From the evidence adduced before it, the Tax Court could not find that the loss occurred in 1951.

■ In Mr. Teitelbaum's view he met all conditions to his right to deduct certain travel and hotel expenses which were disallowed by the Commissioner. Mr. Teitelbaum avers that he was conducting two businesses: a ranch in In-

dio, California, (on which we have heretofore commented) and a law practice in Chicago, Illinois. He argues that his expenses, evidenced by vouchers, receipts, and air travel tickets, were reasonable and necessary, incurred while away from home, directly connected with his businesses and appropriate to them. The evidence to which he refers included receipts for expenditures made while in Chicago. Mr. Teitelbaum states that he owned no home in Chicago from 1947 until 1952, and during that period he resided at a Chicago hotel.

He did travel to Miami, Florida, where his second wife lived, and to Indio, California, where his first wife and family resided. There is no evidence to indicate any business conducted in Florida. We agree with the Tax Court that Mr. Teitelbaum did not support the burden of showing that the date ranch was a venture operated in good faith for profit. There is nothing in the evidence to show that Mr. Teitelbaum made these trips for any purpose other than to visit his relatives. We conclude that the Tax Court properly found no deductible travel or hotel expense beyond that already allowed by the Commissioner.

It is not disputed that the burden of proving fraud rested on the Commissioner. Mr. Teitelbaum takes the position that the Tax Court presumed fraud from mere negative evidence. Fraud is a question of fact. We may not set aside the Tax Court's findings of fraud unless we find them unsupported by substantial evidence and clearly erroneous. Jaeger Motor Car v. Commissioner, 7 Cir., 1960, 284 F.2d 127, 129. The taxpayer's consistent and substantial understatement of income over a period of several consecutive years, considered in the light of all the attendant circumstances, was clear and convincing evidence of fraud. Bender v. Commissioner, 7 Cir., 1958, 256 F.2d 771, 774. The Tax Court found substantial sums which had been distributed to Mr. Teitelbaum, out of the operations of the Douglas and Fine Arts Buildings in Chi-

cago, were not reported as income. Mr. Teitelbaum directed the agency in charge of the buildings to issue letters to him to evidence the amounts which had been paid to him, to his partner, and to the Tyted Company. At his direction, these letters did not reflect amounts which had been disbursed out of the building agency accounts, (on Mr. Teitelbaum's instructions) which were not normally part of the operating expenses of the buildings, and which were reflected on the agency's statements as distribution of income to the owners of the buildings. In reporting net capital gain from the sale of the Douglas Building, Mr. Teitelbaum included an expense item of $200,000 as expenses not theretofore deducted. The evidence adduced before the Tax Court demonstrated that many of the items included in that total had previously been deducted. The $200,000 item appears on a page of the tax return prepared by Mr. Teitelbaum personally and added to a schedule of cost data on a prior page of the return which had been prepared by Mr. Teitelbaum's attorney. The Tax Court was satisfied after hearing the testimony that Mr. Teitelbaum had prepared the addition to the return with knowledge of its falsity and with intent to evade tax.

We have drawn a few examples at random from a voluminous record which supports the Tax Court's finding that the Commissioner established by clear and convincing evidence a pattern of conduct amounting to fraud with intent to evade tax. This conclusion is amply supported by the record without recourse to the additional evidence of Mr. Teitelbaum's criminal fraud convictions.

We have carefully considered all the other issues involved in this case and the various arguments advanced on behalf of Mr. Teitelbaum. It would unduly extend this opinion to no good purpose to comment on each individually. We have found no merit in the petitioner's contentions. The decision of the Tax Court is affirmed.

548

MAJOR, Circuit Judge (concurring in part and dissenting in part).

I concur in and approve of the majority opinion, except as to the item (almost $80,000) expended in the Fine Arts Building for the conversion of electricity from direct current (DC) to alternating current (AC). The Court sustains the Tax Court in its conclusion that this was a capital expenditure rather than "an ordinary and necessary expense paid or incurred during the taxable year in carrying on any trade or business * * *." With this conclusion I do not agree.

I agree that the fact that conversion was required by an ordinance of the City of Chicago is not determinative of the issue. It does, however, remove any doubt but that the expense was necessary. There remains the question as to whether it was ordinary. It has been held that an expense to be ordinary need not be of frequent occurrence but may occur only once. Welch v. Helvering, 290 U.S. 111, 114, 54 S.Ct. 8, 78 L.Ed. 212; Deputy et al. v. du Pont, 308 U.S. 488, 495, 60 S.Ct. 363, 84 L.Ed. 416.

The weakness of the Commissioner's position is demonstrated by his brief. In his statement of facts he relies upon the finding of the Tax Court, "Although the conversion did not increase the value of the building as such, it did affect the amount which a buyer would be willing to pay for the building." I am not able to comprehend how it can be found that the value of the building was not increased and at the same time say that it could be sold for more money. Neither can I accept the argument, made here by the Commissioner, that the conversion increased the market value of the building in face of the finding that its value was not increased. The taxpayer testified that the market value was not increased and his testimony was supported by that of a qualified architect and engineer. If the market value was increased, as now argued, testimony to that effect would have been readily available. None, however, was offered by the Commissioner. Moreover, the fact,

if such it be, that a buyer would be willing after conversion to pay more for the building is no indication that the cost was a capital expenditure. The same contention with equal plausibility could be advanced whether the expenditure was for a necessary and ordinary expense or whether it was for a capital improvement.

A reading of the cases reveals the difficulty courts have had in deciding the question under consideration. Each case must depend largely on its own facts. Jones v. Commissioner, 5 Cir., 242 F.2d 616, 620. In that case, the Court quotes from the Board of Tax Appeals as to the distinction between deductible repairs and non-deductible disbursements as follows (242 F.2d at page 619):

"'A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use.'"

In the instant case, the expenditure was for the purpose of keeping the property in an operating condition, did not add to its value (according to the finding of the Tax Court), did not appreciably prolong its life and did not make it adaptable to a different use.

Two cases, much relied upon by the government and cited in the majority opinion, are RKO Theatres, Inc. v. United States, Ct.Cl., 163 F.Supp. 598, and Woolrich Woolen Mills v. United States, 289 F.2d 444 (C.A.–3). The former case, written for the Court of Claims by Justice Reed (retired), reviews many cases and is often cited. In that case, the taxpayer in compliance with law provided new exit facilities and fire escapes from

its theatre. The Court sustained the Commissioner's holding that the expenditure was for a capital improvement. In distinguishing cases relied upon by the taxpayer, the Court stated (163 F.Supp. at page 602):

> "The additions and changes were not in any sense a repair or replacement of existing facilities. They were permanent changes designed to make it possible to carry on a business for profit."

In the instant case, the conversion was only the replacement of existing facilities and was not designed to make it possible to carry on a business for profit. That was already being done. On the same page, the Court stated:

> "This was not a repair, 'a substitution of new parts or restoration of certain parts of a given whole,' but a capital improvement made to increase the value of the property for use in the taxpayer's theatre business."

Again, in the instant case, there was only a substitution of new facilities for the old, not an improvement designed to increase the value of the building for the use to which it was put.

The Woolrich case is also distinguishable on its facts. There, the expenditure was for a filtration plant, constructed in compliance with a state law, for treatment of waste from a woolen mill. The plant consisted of a building with its contents located approximately one-third of a mile from taxpayer's mill. The Court in holding this to be a capital expenditure distinguished cases relied upon by the taxpayer as follows (page 448):

> "Those cases involved outlays of moneys for alterations of existing structures which, on the facts present in those cases, the Tax Court held to constitute repairs. We are not confronted here with a similar situation."

The situation which did not exist in that case is present here where there was the alteration of an existing structure and the substitution of a new facility for the old which served the same purpose without increasing the value of the building or the taxpayer's income derived therefrom.

I would hold that the conversion expenditure was a necessary and ordinary expense and reverse the Tax Court in that respect.