47 F.3d 1165
 75 A.F.T.R.2d 95-1190, 95-1 USTC P 50,119
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
LEON H. PERLIN COMPANY, INCORPORATED; Leon H. Perlin;
Phyllis F. Perlin, Petitioners-Appellants,
COMMISSIONER OF THE INTERNAL REVENUE SERVICE, Respondent-Appellee.
 No. 93-2521.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 8, 1994.
Decided Feb. 14, 1995.
 
 On Appeal from the United States Tax Court.
 U.S.T.C.
 REMANDED.
 ARGUED: Bruce E. Priddy, WEINER, BRODSKY, SIDMAN & KIDER, Washington, DC, for Appellants. Sara S. Holderness, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Wash ington, DC, for Appellee. ON BRIEF: Richard J. Melnick, WEINER, BRODSKY, SIDMAN & KIDER, Washington, DC; Robert G. Nath, ODIN, FELDMAN & PITTLEMAN, P.C., Fairfax, VA, for Appellants. Loretta C. Argrett, Assistant Attorney General, Gary R. Allen, Bruce R. Ellisen, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, DC, for Appellee.
 Before WILKINS and LUTTIG, Circuit Judges, and LAY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 OPINION
 WILKINS, Circuit Judge:
 
 
 1
 Appellants Leon H. Perlin (Perlin); his wife, Phyllis F. Perlin; and Leon H. Perlin Company, Incorporated (the Perlin Company)[1] (collectively, "Taxpayers"), appeal a decision of the tax court holding that Taxpayers owed additional tax as a result of the disallowance of a bad-debt deduction taken by the Perlin Company on its corporate income tax return for the fiscal year ending May 31, 1984 and a determination that Perlin received additional income in 1984 in the form of a constructive dividend from the Perlin Company. The tax deficiencies flowed from the valuation by the tax court of a claim for unsecured advances that was distributed from the Perlin Company to Perlin and then sold by Perlin to a third party. Because we conclude that the tax court clearly erred in determining the value of this claim, we remand for further proceedings.
 
 I.
 
 2
 Prior to 1977, GMR Properties (GMR) owned approximately 1,400 acres of property in James City County, Virginia (the Property). In late 1977, Hab Baker, III approached Perlin to inquire whether he would loan Baker funds to purchase and develop the Property as a residential community. Baker proposed to purchase the Property through Middle Plantation of Williamsburg, Inc. (MPW), a corporation in which Baker owned an 84% interest.
 
 
 3
 Perlin and Baker entered a contract under which Perlin agreed to loan MPW $350,000 by advancing $325,000 in cash and cancelling a $25,000 note evincing a debt that Baker already owed to Perlin. In return, Baker executed a note on behalf of MPW in the face amount of $380,000[2] to Perlin, secured in part by a second deed of trust on the Property and Baker's general partnership interest in a limited partnership, Tidewater Green Enterprises, which owned 29 condominiums known as the Georgetown condominiums. Perlin also received 8.5% of MPW's stock. MPW paid $250,000 as a down payment on the Property and executed a note to GMR for $1.5 million, secured by a first deed of trust on the Property. Between 1978 and 1981, the Perlin Company made additional advances to MPW totaling $494,101; these advances were unsecured.
 
 
 4
 By mid-1981, Baker's attempt to develop the Property was failing, and MPW was in default on both the $1.5 million note to GMR and the $380,000 note to Perlin. Perlin had decided not to advance additional funds to MPW and was very concerned about protecting his interests. Perlin "foreclosed" on his security interest in Baker's partnership interest in Tidewater Green, taking title to the 29 Georgetown condominiums.[3] In addition, Perlin began negotiations with experienced developers Richard Ford and Gary Steadman--President and Executive Vice President, respectively, of Realtec, Inc.--concerning purchase of the Property.
 
 
 5
 Realtec eventually approached Baker concerning its desire to purchase the Property, but the parties could not agree on the terms of a sale. Subsequently, the successor entity to GMR contacted Perlin to determine whether he would be interested in purchasing the note secured by the first deed of trust on the Property at a discount. The outstanding principal balance on the note was then $1,092,442.50. Believing that acquisition of the note and first deed of trust on the Property would improve their chances of obtaining the Property at a favorable price, Perlin and Realtec formed a partnership, Long Hill Properties Joint Venture (Long Hill), which acquired the note for $400,000. Perlin and Realtec each held a 50% interest in the partnership, but Realtec was given the sole authority to make determinations regarding collection and foreclosure. The joint venture agreement also contemplated that if Long Hill were successful in obtaining the Property, the same parties would enter into another joint venture to develop the Property; this portion of the agreement envisioned that the future joint venture would assume liability for the amounts Perlin and the Perlin Company had loaned or advanced to MPW, approximately $900,000.
 
 
 6
 After Long Hill purchased the note, it sent MPW a default notice, followed by a notice of intent to foreclose on the Property. In March 1982, MPW filed for protection under Chapter 11 of the bankruptcy code to forestall foreclosure and attempt to reorganize. Perlin and the Perlin Company filed a proof of claim with the bankruptcy court in the amount of $822,963.93 plus interest, attorneys' fees, and costs. And, Long Hill filed a proof of claim in the amount of $1,266,758.55 plus interest, attorneys' fees, and costs based on the note secured by the first deed of trust on the Property.
 
 
 7
 An initial plan offered by Realtec, under which it would acquire the Property and pay all claims of unrelated parties, was not approved by the bankruptcy court. As the bankruptcy proceedings progressed, Realtec became discouraged by the delay and ever-increasing expense of the bankruptcy proceedings and began to consider abandoning its endeavor to obtain the Property. Ultimately, Realtec concluded that it would continue to pursue acquisition of the Property only if it could eventually secure a 100% interest in the Property. Thus, Realtec began to consider purchasing Perlin's interests. Steadman testified that when Realtec began to consider this course, he attempted to determine the amount of Perlin's investment, assuming that Perlin would wish to at least recoup this amount in a sale of his interests. Perlin and Realtec entered negotiations and eventually reached an agreement, executed in 1983, which was contingent upon Realtec being able to obtain the Property. The interests to be purchased by Realtec in the transaction were:
 
 
 8
 (1) Perlin's one-half interest in Long Hill, which owned the note secured by the first deed of trust (Perlin had invested approximately $249,805 ($200,000 for the note and $49,805 in attorneys' and accounting fees and expenses).);
 
 
 9
 (2) Perlin's interest in the Georgetown condominiums that he had acquired after MPW defaulted on the $380,000 note (Perlin's basis in the condominiums and the value of Perlin's interest in them is unclear.);
 
 
 10
 (3) The Perlin Company's claim against MPW for the unsecured advances totaling $494,101; and
 
 
 11
 (4) Perlin's stock in MPW.
 
 
 12
 In payment for these interests Realtec agreed to make an initial cash payment of $249,805 to Perlin and execute four notes, each in the face amount of $250,000. These notes were due nine months, two years, five years, and ten years, respectively, after Realtec obtained the Property. The first note was to be non-interest bearing, and the second and third notes were to bear interest, to be paid annually, within certain specified collars. The fourth note--the "contingent" note--was to be contingent as to both principal and interest depending on Realtec's profits in developing the Property; but, no interest was due on the contingent note for the first five years. To further complicate matters, the treatment accorded to the Georgetown condominiums was also made contingent upon various circumstances. If "a bankruptcy plan or settlement [were] ultimately approved that [did] not include the Georgetown" condominiums, the agreement provided that Realtec would reduce the total consideration paid to Perlin by eliminating the payment due under the first $250,000 note and reducing the second note by one-half of the net profits realized by Perlin on the sale of the condominiums--an amount between $250,000 and $500,000. Further, in the event Perlin received a distribution from the bankruptcy proceedings, the amount received would be applied dollar-for-dollar against the notes from Realtec, with the amounts being applied first to the contingent note. The agreement did not allo cate the amounts to be paid by Realtec to the assets Realtec was acquiring.
 
 
 13
 Thereafter, Long Hill presented a plan to the bankruptcy court, which the court affirmed on October 5, 1983. Pursuant to this plan, a subsidiary of Realtec's took title to the Property, and all of the other claims against the MPW bankruptcy estate were satisfied; Perlin received nothing through the bankruptcy proceedings. Consummation of the plan occurred between March and April 1984. On April 4, 1984, Realtec forwarded the initial $249,805 payment and the four notes to Perlin. Perlin transferred the Georgetown condominiums that had not been sold, and the net proceeds from the condominiums that had been sold, to Baker's assignees and attorneys. In December 1984, the first note became due, and Realtec paid Perlin an additional $250,000.
 
 
 14
 In their 1984 joint individual income tax return, Perlin and his wife reported $399,905 as a long-term capital gain with respect to the $499,805 received from Realtec--treating the sale as an installment sale of Perlin's interest in Long Hill. The Perlin Company claimed a bad-debt deduction for $494,101--the full amount of the advances by the Perlin Company to MPW--in its corporate income tax return filed for fiscal year ending May 31, 1984. The Commissioner subsequently issued deficiency notices against the Perlin Company, disallowing the bad-debt deduction and assessing tax deficiencies in the amounts of $20,749, $54,194, and $108,963 for fiscal years 1981, 1982, and 1984 respectively. The Commissioner also issued a deficiency notice against the Perlins, determining that Perlin had received a constructive dividend of $494,101 and assessing additional tax in the amount of $153,056 against the Perlins.
 
 
 15
 Taxpayers filed petitions in the tax court. Following trial on the consolidated petitions, the tax court ruled in favor of the Commissioner, holding that the claim for the unsecured advances by the Perlin Company did not become worthless in 1984 and that Perlin had received a constructive dividend in the amount of $494,101 in 1984 when the Perlin Company distributed the claim for the unsecured advances to him. In reaching these conclusions, the tax court found that Perlin had sold his interests in Long Hill for $249,805; the Georgetown condominiums for less than $350,000; and the claim for the unsecured advances for $494,101. The reasoning underlying the valuation decision by the tax court was that Realtec intended to compensate Perlin for his investment in the assets, so Perlin's investment must be the value intended by the parties. The tax court determined that it did not need to make a specific finding on the exact amount Perlin received from Realtec or the value of Perlin's interest in the Georgetown condominiums. Taxpayers appealed to this court.
 
 II.
 
 16
 In computing taxable income, 26 U.S.C.A. Sec. 166(a)(1) (West 1988) provides a deduction for "any debt which becomes worthless within the taxable year." Moreover, "[w]hen satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction." 26 U.S.C.A. Sec. 166(a)(2) (West 1988). Because deductions are a matter of congressional grace, the taxpayer bears the burden of establishing that the conditions for the deduction are satisfied; thus, the burden was on the Perlin Company to show that the debt became worthless, in whole or in part, in its fiscal year 1984. See IRS v. Levy (In re Landbank Equity Corp.), 973 F.2d 265, 269 (4th Cir.1992). "In determining whether a debt is worthless in whole or in part ... all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor," is considered. 26 C.F.R. Sec. 1.166-2(a) (1984). Generally, "[b]ankruptcy is ... an indication of the worthlessness of at least a part of an unsecured and unpreferred debt." 26 C.F.R. Sec. 1.166-2(c)(1) (1984). But, the mere filing of a bankruptcy petition is not dispositive of the worthlessness of a debt because there may be assets available for payment. See Teitelbaum v. Commissioner, 294 F.2d 541, 546 (7th Cir.1961), cert. denied, 368 U.S. 987 (1962).
 
 
 17
 A distribution of property from a corporation to a shareholder with respect to its stock is a taxable dividend to the extent of the corporation's earnings. 26 U.S.C.A. Secs. 301, 316 (West 1988). A constructive dividend occurs when a stockholder in a corporation receives an economic benefit from the corporation without giving value in return. See Boris I. Bittker & James S. Eustice, Federal Income Taxation of Corporations & Shareholders p 8.05 (6th ed.1994). The amount of the dividend for noncorporate distributees is "the amount of money received, plus the fair market value of the other property received." 26 U.S.C.A. Sec. 301(b)(1)(A).
 
 
 18
 Taxpayers admit on appeal that the claim for the unsecured advances was not totally worthless, but contend that the tax court clearly erred in valuing the claim at its face amount. The Perlin Company concedes that if the claim for the unsecured advances was not totally worthless, the bad-debt deduction was improper to the extent of the value of the claim. But, the Perlin Company asserts that the claim was worthless in part, and therefore its deduction should have been allowed in part. The Perlins agree that to the extent that the claim for the unsecured advances had some value, Perlin received a constructive dividend in the amount of that value; however, because the claim should not have been valued at its face amount, they claim that the tax court erred in concluding that Perlin received a constructive dividend in the face amount of the claim. Thus, the central issue presented is whether the tax court committed clear error in determining the value of the claim for the unsecured advances.[4]
 
 
 19
 This court reviews the factual findings of the tax court for clear error. Hendricks v. Commissioner, 32 F.3d 94, 97 (4th Cir.1994). If two permissible views of the evidence exist, the choice between them by the tax court cannot be clearly erroneous. Id. Thus, a factual finding by the tax court is clearly erroneous only when " 'although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed.' " Id. (quoting Faulconer v. Commissioner, 748 F.2d 890, 895 (4th Cir.1984)).
 
 
 20
 The tax court approached the question of the value placed on the claim for the unsecured advances in two ways. First, it considered the impact of the Realtec agreement and whether the Perlin Company had demonstrated adequately that it could not have recovered the entire amount of its claim for the unsecured advances through the MPW bankruptcy. Second, it addressed whether a portion of the proceeds from the sale to Realtec was properly allocated to the claim for the unsecured advances based on the respective fair market value of the assets purchased. We consider these methods of valuation in turn.[5]
 
 A.
 
 21
 The tax court found that the Perlin Company had not carried its burden of proving that the claim for the unsecured advances could not have been recovered through the bankruptcy estate, even in part.
 
 
 22
 Next, relying on the testimony of Realtec's Executive Vice President, Steadman, that in beginning negotiations with Perlin Realtec based its price for Perlin's interests on the amount it believed that he had invested, the tax court reasoned that in reaching the agreement with Realtec, Perlin intended to recoup the unsecured advances the Perlin Company had made to MPW. The tax court concluded that Perlin would not have entered into the agreement with Realtec unless he could have recovered the amounts he advanced to MPW.
 
 
 23
 The Commissioner first maintains that the tax court was correct in concluding that the mere fact that MPW had filed for protection in bankruptcy was insufficient to support a finding that the claim for the unsecured advances had become worthless; that the Perlin Company had failed to demonstrate that if it had pursued its claim through the bankruptcy proceedings it could not have received repayment of the claim; and that there was no evidence presented that the assets of the MPW bankruptcy estate were insufficient to satisfy all of the claims against the estate or that a more favorable plan of reorganization existed. This basis for the decision of the tax court, however, ignores economic reality. Cf. Bowers v. Commissioner, 716 F.2d 1047, 1049 (4th Cir.1983) (per curiam) (noting that in determining the proper tax treatment for financial transactions, the court need not disregard "common sense or financial realities").
 
 
 24
 It is undisputed that in entering the agreement with Realtec, Perlin was acting in his own best economic interest. The only evidence presented to the tax court demonstrated that Realtec was the only viable purchaser for the Property and that no more favorable plan of reorganization for MPW existed. Thus, Perlin's best prospect to maximize his recovery was to facilitate Realtec's acquisition of the Property. If any reasonable expectation existed that the assets of the MPW bankruptcy estate were sufficient, or that a more favorable plan of reorganization existed, to permit satisfaction of all of the secured and unsecured claims against the estate, it would have been in Perlin's economic interest to continue with the bankruptcy proceedings because he would have recovered far more through them. Had the assets of the MPW bankruptcy estate been sufficient to satisfy all of the secured and unsecured claims, Perlin--through his one-half interest in Long Hill--would have received one-half of the proceeds from the note secured by the first deed of trust on the Property (at least $633,000); the balance of the $380,000 note secured by the second deed of trust on the Property; and the $494,101 in unsecured advances--an amount well in excess of the amount he received in his agreement with Realtec. Consequently, the only reasonable construction of the evidence presented to the tax court is that there were insufficient funds in the bankruptcy estate to satisfy all of the claims and that no more favorable plan of reorganization was available. As a low-priority claim, the Perlin Company's claim for the unsecured advances, therefore, would not have been paid in full; indeed, if the same distribution had been made through the bankruptcy proceedings, it is clear that at most only a very small percentage of the proceeds would have been recovered for the claim for the unsecured advances.
 
 
 25
 The Commissioner next argues that the decision of the tax court that the claim for the unsecured advances was worth its face amount is not clearly erroneous because Steadman's testimony supports the conclusion that Realtec agreed to satisfy the claim for the unsecured advances in its agreement with Perlin. The Commissioner, however, misconstrues Steadman's testimony. Although he testified that Realtec began negotiations for Perlin's interests from the amount it believed Perlin had invested with MPW, Steadman stated unequivocally that Realtec had no intent to satisfy the Perlin Company's claim for the unsecured advances. Rather, Steadman testified that Realtec's intent merely was to purchase all of Perlin's interests in order to obtain a 100% equity interest in the Property. Thus, the Commissioner's reliance on Steadman's testimony begs the question of the value of the claim for the unsecured advances.[6]
 
 
 26
 We determine that on the evidence presented the only reasonable conclusion that could be reached is that the claim for the unsecured advances would not have been paid in full through the bankruptcy proceedings. In addition, we cannot accept the finding of the tax court that the Realtec agreement constituted an agreement by Realtec to satisfy the Perlin Company's claim for the unsecured advances. Thus, the tax court clearly erred in failing to find that some portion of the claim was worthless.
 
 B.
 
 27
 This conclusion is further supported by an analysis of the allocation of fair market value attributed to the assets purchased by Realtec in its agreement with Perlin, which demonstrates that the allocation was irrational. The parties agree that the tax court properly attempted to allocate the proceeds of the Realtec sale among the assets purchased based on their fair market value on the date of the sale and that to the extent that a portion of the sales price was properly allocated to the claim for the unsecured advances the claim correctly could be viewed as having that value for purposes of determining whether the Perlin Company was entitled to a bad-debt deduction and the amount of the constructive dividend received by Perlin. However, Taxpayers assert that the tax court clearly erred in the allocation made.
 
 
 28
 As previously noted, the tax court valued Perlin's partnership interest in Long Hill at the amount of his investment in the partnership--$249,805--and the claim for the unsecured advances at its face amount of $494,101. The only asset held by the partnership was the note secured by the first deed of trust interest on the Property; the balance of that note was $1,266,758.55 when the proof of loss was filed with the bankruptcy court. The tax court reasoned that because the note had been sold in an arm's length transaction for $400,000 in 1981 and because none of the evidence presented indicated that the note had become more valuable since that date, this was a fair value for the note.
 
 
 29
 While this finding by the tax court is not without merit, if it is accepted, it points to the irrationality of the determination by the tax court that the claim for the unsecured advances was worth its face amount. The note held by Long Hill was secured by a first deed of trust on the Property. If that note was worth less than 40% of its face value, it is inconceivable that the claim for the unsecured advances--which could have been satisfied only after the note secured by the first deed of trust and the note secured by the second deed of trust--was worth more than the note secured by the first deed of trust.
 
 
 30
 The Commissioner argues that the allocation of $249,805 was a reasonable value for Perlin's partnership interest in Long Hill because even if the note secured by the first deed of trust had a value greater than $400,000, Perlin's one-half interest in the Long Hill partnership did not. The Commissioner asserts that Long Hill had a significant liability that offset the asset of the note, thereby reducing the partnership's value. According to the Commissioner, this liability was a result of a provision of the joint venture agreement obligating Long Hill to assume some $900,000 of liability to Perlin. This argument lacks merit.
 
 
 31
 The provision concerning the assumption of MPW's liability to Perlin was included in the portion of the joint venture agreement relating to the parties' intention to form a new joint venture if Long Hill were successful in obtaining the Property from MPW. Long Hill had no liability to Perlin for these amounts unless and until the partnership obtained the Property. And, since Realtec had the sole authority to determine whether there would be a foreclosure on the Property, it would be irrational to assume that Realtec would take steps to obtain the Property if it were not going to profit from doing so. In other words, if Long Hill obtained the Property, Long Hill would assume the liability to Perlin, but it would also have another asset--he Property. Accordingly, the Commissioner's position that Long Hill had a liability that made the partnership worth less than the value of the note is simply incorrect factually and illogical from an economic standpoint.[7]
 
 C.
 
 32
 In sum, we conclude that the tax court clearly erred in finding that the claim for the unsecured advances was worth its face amount. Thus, the decisions of the tax court based on this finding--i.e., that the Perlin Company was not entitled to a bad-debt deduction and that Perlin received a constructive dividend in the full face amount of the claim--were incorrect. Because the tax court failed to make a finding concerning the value of the consideration Realtec paid to Perlin for the interests it purchased from him as well as the value of Perlin's interest in the Georgetown condominiums, we are unable to determine the value that should be attributed to the claim for the unsecured advances. Thus, we remand to the tax court for further consideration of this question.
 
 III.
 
 33
 The Perlins next contend that the constructive dividend of the claim for the unsecured advances could not have occurred in 1984--the year for which the deficiency was assessed. The tax court found that the Perlin Company had conferred a constructive dividend on Perlin by distributing the claim for the unsecured advances to him in 1984. The tax court went on to note:
 
 
 34
 It could be argued that [Perlin] received the constructive dividend in 1983 before he entered into negotiations with Realtec. [Perlin] could not have negotiated the transfer to Realtec of all of his and his company's claims against [MPW] if the Perlin Company had not already in effect conferred the benefit of the claim for the Unsecured Advances on [Perlin] with no expectation of repayment. However, since both parties agree that the Realtec Agreement did not become effective ... until 1984, we find that the constructive dividend, as well, was received by [Perlin] in 1984.
 
 
 35
 Based on this language, the Perlins maintain that the tax court found that the constructive dividend must have occurred prior to Perlin's execution of the agreement with Realtec in 1983 and that, therefore, the tax court was clearly erroneous in determining that the distribution occurred in 1984. We cannot agree.
 
 
 36
 Perlin is incorrect in his characterization of the statement by the tax court that he could not have negotiated for the sale of the claim unless it had already been distributed to him. In our view, this statement plainly represents a continuation of the argument presented by the tax court in the previous sentence. The tax court was merely making clear that one construction of the evidence would have permitted a finding that the distribution of the claim occurred in 1983. However, the tax court ultimately found that the distribution did not occur until the Realtec sale became effective in 1984. We cannot conclude that this finding is clearly erroneous inasmuch as nothing prevented Perlin from negotiating for the sale of an asset that was owned by his closely-held corporation. The finding by the tax court that the distribution occurred in 1984 is based on a permissible view of the evidence.
 
 IV.
 
 37
 Finally, the Perlins contend that because the tax court allocated some of the proceeds from the Realtec sale to Perlin's interest in the Georgetown condominiums, they should be permitted to reduce the amount of the gain on the sale by his basis in that asset. The Commissioner contends that the Perlins did not raise this claim below; that the information necessary to establish the basis in this asset is not in the record; and that, accordingly, this court should not consider the argument. The Perlins do not dispute that they did not raise this issue before the tax court, but maintain that they could not have anticipated their need to do so because neither they nor the Commissioner had considered that the proceeds from the Realtec sale would be allocated to the Georgetown condominiums. Further, the Perlins concede that the evidence necessary to determine the basis in the asset is not a part of the record, but contend that a remand for further proceedings would be appropriate.
 
 
 38
 The tax court contemplated that following its ruling a recalculation of the tax deficiencies would be necessary and recognized that some adjustment in basis attributable to the sale would be required. Thus, we cannot conclude at this juncture that the tax court intended to foreclose the Perlins from adjusting their basis in the assets sold to Realtec following its ruling. Inasmuch as further consideration by the tax court is required in any event, we determine that the tax court should address this argument as well on remand.
 
 V.
 
 39
 We hold that the tax court clearly erred in valuing the claim for the unsecured advances, leading to the disallowance of the entire amount of the Perlin Company's bad-debt deduction and the attribution of the full face value of the claim for the unsecured advances to Perlin as a constructive dividend. However, because the record will not permit this court to determine the proper value of the claim for the unsecured advances, we remand for further proceedings in accordance with this opinion. In addition, the tax court must consider whether the Perlins should be permitted to offset the gain on the Realtec sale with Perlin's basis in the Georgetown condominiums.
 
 REMANDED WITH INSTRUCTIONS
 LUTTIG, Circuit Judge, dissenting:
 
 40
 The majority concludes that the Tax Court clearly erred in valuing Perlin Company's unsecured claims against MPW. The majority reaches this conclusion largely on the reasonable assumption that the unsecured claims could not possibly have had full value because the obligor company was in bankruptcy. I believe, however, that the purchase agreement between Perlin Company and Realtec constitutes the most reliable measure of the value of Perlin's various interests, and because that agreement appears to ascribe full value to these unsecured claims, I dissent.
 
 
 41
 Perlin's agreement with Realtec contemplated the sale of Perlin's and Perlin Company's three interests whose values are in dispute. First, the agreement valued Perlin's 50% interest in Long Hill, whose sole asset was the secured note, at $249,804.87:
 
 
 42
 [W]e anticipate purchasing, in cash on the date of acquisition of the project, your $200,000 share in the GMR mortgage [Long Hill's sole asset], plus returning to you that portion of the legal and accounting fees you have paid us with respect to the litigation, which our records indicate totals $49,804.87.
 
 
 43
 J.A. at 301. Second, the agreement valued Perlin's interest in the Georgetown Apartments at a value between $250,000 and $500,000:
 
 
 44
 If ... a bankruptcy plan or settlement is ultimately approved that does not include the Georgetown Apartments ... the cash portions of our arrangement will be reduced by elimination of the $250,000 due six to nine months after acquisition of the property, and the $250,000 note payable two years after the date of acquisition will be reduced by an amount equal to one-half of the net proceeds ultimately realized by you from the disposition of the units.
 
 
 45
 J.A. at 302. Subtracting the total of these prices from the total purchase price of approximately $1.25 million yields a value between $500,000 and $750,000. Because there were only three interests transferred, it is reasonable to assume that the parties ascribed a value of this amount to the unsecured claims. Indeed, even if one were to discount entirely the agreement's final $250,000 payment because of its contingencies, subtraction of the two assigned values from the total consideration paid still potentially yields an amount in excess of $494,101, the value ascribed to the unsecured claims by the Tax Court.*
 
 
 46
 The Tax Court performed essentially this calculus, with minor differences, in reaching its conclusion. The Tax Court adopted the value of $249,805 for Perlin's interest in Long Hill, a valuation mandated by the agreement with Realtec. The Tax Court then assigned a value of "something less than $350,000" to Perlin's interest in the Georgetown Apartments. Although I question the Tax Court's methodology in arriving at this valuation for the apartments, I cannot say that the valuation is clearly erroneous, for it falls squarely within the range of $250,000 to $500,000 that the parties themselves assigned to the apartments. The Tax Court then subtracted these values from the total purchase price and found there to be sufficient consideration to compensate Perlin Company at face value for its unsecured claims. Because ascribing full value to the unsecured claims through this methodology is at least reasonable, even though it may not necessarily be "correct," I cannot conclude that the Tax Court clearly erred.
 
 
 47
 I am especially reluctant to find the Tax Court's determinations clearly erroneous when it appears rather clearly that Perlin failed to meet his burden of proving entitlement to a worthless debt deduction. See In re Landbank Equity Corp., 973 F.2d 265, 269 (4th Cir.1992) ("Under the Tax Code," when a taxpayer claims a bad debt deduction, " 'the burden is squarely placed upon the taxpayer to bring himself clearly within the statutory provisions authorizing the claimed deduction.' " (citation omitted)). Perlin in fact produced no direct evidence of the value of the unsecured claims. Instead, like the Tax Court, he attempted to value the secured note and the apartments and then subtract these values from the total consideration paid; Perlin simply assigned higher values to the first two interests, leaving no residual for the third. Thus, if the Tax Court ascribed the "wrong" value to Perlin Company's unsecured claims, it is ultimately because Perlin himself failed to produce to the IRS or the Tax Court reliable evidence of their value. As the Tax Court noted, if its "approach does not correspond with the true fair market values of [Perlin's and Perlin Company's] interests and claims, [Perlin and his company] have not presented any credible evidence to the contrary." J.A. at 237.
 
 
 48
 That Perlin Company's claims were in bankruptcy would seem to be of no moment, because the Perlin Company in fact found a purchaser for its interests outside of the bankruptcy proceedings and consummated the sale. The disparity between the valuations of the secured note and the unsecured claims, on its face, may be perplexing, but if the parties so valued the properties, then the Tax Court should be permitted to rely upon those valuations, or their equivalents. At the very least, it cannot be said to have clearly erred in so doing. Accordingly, I would affirm the judgment of the Tax Court.
 
 
 
 [1]
 Perlin owned all of the outstanding stock in the Perlin Company
 
 
 [2]
 The contract provided that if the note were satisfied timely the balance would be reduced by $30,000
 
 
 [3]
 To finance acquisition of the condominiums, Perlin was forced to borrow $725,000 to refinance the first mortgages
 
 
 [4]
 Before turning to address the valuation question, we note that the Commissioner argues that the Perlin Company is foreclosed from arguing on appeal that it was entitled to a partial bad-debt deduction because it argued below that the claim for the unsecured advances was totally worthless. We disagree. The Commissioner admits that the Perlin Company raised the question of partial worthlessness in its pleadings before the tax court. Further, the tax court recognized that the question of partial worthlessness was before it. See Leon H. Perlin Co. v. Commissioner, Nos. 89-12026, 89-12027 (T.C. March 9, 1993) (stating that the Perlin Company had "the burden of proving that some or all of the $494,101 Unsecured Advances to MPW became worthless"). Thus, although the Perlin Company advanced only the most aggressive position before the tax court, it did raise the issue of partial worthlessness below. Accordingly, the Commissioner was given the opportunity to evaluate whether the Perlin Company was entitled to a partial bad-debt deduction, see 26 U.S.C.A. Sec. 166(a)(2), but took the position that the bad-debt deduction was not proper, even in part. The Commissioner does not assert that its decision concerning the appropriateness of a partial bad-debt deduction is unfettered or is not subject to judicial review. Therefore, we conclude that the question of partial worthlessness of the claim for the unsecured advances is properly before this court
 
 
 [5]
 The dissent's contention that the Realtec agreement attributed values to Perlin's interests in Long Hill and the Georgetown condominiums was not argued to this court by either of the parties, nor was it used by the tax court as a basis for its decision. Indeed, the Commissioner did not argue to this court that the Realtec agreement attributed values to Perlin's interests, instead maintaining that "the parties made no specific allocation of the purchase price to the assets sold." Moreover, our reading of the Realtec agreement as a whole leads us to conclude that the passages on which the dissent relies were not intended as an attribution of specific values to those assets. At best, the agreement is ambiguous on this point, and the undisputed testimony of the parties to the agreement was that, with the exception of the Georgetown condominiums, no valuation of the assets was intended. Accordingly, we do not believe that the valuation by the tax court of the claim for the unsecured advances can be supported by reference to the Realtec agreement
 
 
 [6]
 We also reject the Commissioner's argument that the provision in the Realtec agreement calling for a dollar-for-dollar reduction in the Realtec notes for any amounts received by Perlin through the bankruptcy proceeding in some way supports the decision of the tax court. Steadman testified that this provision was included in the agreement to account for the fact that Perlin would not be required to execute an assignment of his claims against the bankruptcy estate; the provision merely recognized that Realtec had purchased all of Perlin's claims and to the extent that the bankruptcy estate distributed funds on those claims, the distribution "belonged" to Realtec
 
 
 [7]
 The Commissioner also contends that Perlin's partnership interest in Long Hill was worth less than one-half of the value of the note because Perlin had agreed to permit Realtec to have sole discretion in determining collection of and foreclosure on the note. We disagree. It may well be that Realtec's entitlement to resolve collection and foreclosure decisions could have affected the value of the note. For example, if Realtec had made foolish decisions concerning collection or foreclosure, the note might have been worth less. But, there was no evidence presented that the value of the note or the value of Perlin's interest in the partnership was reduced by Realtec's responsibility for collection and foreclosure decisions. And, Realtec's responsibility for these issues did not impact Perlin's equity position in the partnership
 
 
 *
 The majority's assertion that neither the Tax Court nor the parties relied on the Realtec agreement in support of their valuation of the Long Hill note and the Georgetown Apartments is incorrect. Ante at 9 n. 5. The Tax Court explicitly relied on the Realtec agreement to value the secured note, see J.A. at 242 (valuing the secured notes at "the amount agreed upon ... in an arm's-length transaction"), and the court specifically quoted and discussed the paragraph from the Realtec agreement relating to the value of Perlin's interest in the Georgetown Apartments, J.A. at 242
 Both parties have also relied on the Realtec Agreement, in one way or another, to arrive at their valuations. In its brief before this court, the IRS argued that "[t]he Tax Court's valuation of Mr. Perlin's interest in the condominiums, like taxpayers' valuation, clearly falls within the $250,000 to $500,000 range specified in the Realtec Agreement." Appellee's Br. at 35 n. 15. And Perlin himself argued to the Tax Court below that the Realtec agreement accurately reflects the parties' intent to allocate to the Georgetown Apartments a value between $250,000 and $500,000. J.A. at 236.